## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CG, et al., | : | |
| Plaintiffs | : | Civil Action No. 1:06-CV-1523 |
| | : | |
| v. | : | (Chief Judge Kane) |
| | : | |
| THE COMMONWEALTH OF | : | |
| PENNSYLVANIA DEPARTMENT OF | : | |
| EDUCATION and GERALD | : | |
| ZAHORCHAK, | : | |
| Defendants | : | |

## MEMORANDUM

The Court conducted a bench trial in the above captioned matter.  The record is now closed, and the Court is prepared to render its judgment.  This memorandum constitutes the Court's findings of fact and conclusions of law made pursuant to Rule 52 of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 52(a)(1).

## I.    PROCEDURAL BACKGROUND

Plaintiffs commenced this action in this Court on August 4, 2006, naming the Commonwealth of Pennsylvania Department of Education and its Secretary, Gerald Zahorchak, as Defendants.  (Doc. No. 1.)  Plaintiffs filed an amended complaint on September 1, 2006 alleging violations of: (1) the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq.; (2) Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794; (3) Title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 et seq.; (4) the Equal Educational Opportunities Act of 1974 ("EEOA"), 20 U.S.C. § 1701 et seq.; and (5) the Due Process Clause of the Fourteenth Amendment, U.S. Const. amend. XIV.  (Doc. No. 4.) Defendants filed a motion to dismiss, which the Court denied on February 25, 2008.  (Doc. No.

31.)  On November 3, 2008, the Court reconsidered the motion to dismiss and granted the motion

as to Plaintiff G.J., concluding that Plaintiff G.J.'s claims must fail for lack of standing.  (Doc.

No. 55.)  On September 29, 2009, the Court certified two classes in this matter.  (Doc. No. 133.)

The first class consists of special-needs students attending Pennsylvania school districts that

have a seventeen percent or higher enrolled population of special-needs students and a

market/value personal income ("MV/PI") ratio of .65 or greater.  The second class consists of

Limited English Proficiency ("LEP") special-needs students attending schools with a ten percent

or greater population of LEP students.[1]

On January 28, 2011, the Court granted in part and denied in part Defendants' motion for

summary judgment and denied Plaintiffs' motion for summary judgment.  (Doc. No. 190.)  The

Court held that insofar as Plaintiffs were pursuing relief against Defendant Zahorchak in his

individual capacity, those claims were barred by the ADA and Section 504.  In addition, the

Court held that Plaintiffs' due process claim failed as a matter of law.

Trial in this matter was originally scheduled to commence on March 21, 2011.  (Doc. No.

189.)  However, during the pretrial conference, held on March 2, 2011, the Court continued trial

and reopened discovery for the purpose of allowing Defendants to conduct depositions of some

thirteen witnesses who were disclosed to Defendants for the first time in Plaintiffs' pretrial

memorandum.  (Doc. No. 206.)  Following the close of the supplementary discovery period, the

Court conducted a bench trial in the above captioned matter over the course of seven days

between September 14, 2011, and September 23, 2011.  The parties submitted amended

---

[1] Although the districts themselves are not party to this action, for ease of reading the
Court will refer to the school districts attended by children in the two classes as "class districts."

2

proposed findings of law and conclusions of fact on January 23, 2012.  (Doc. Nos. 276, 277.)

## II.    FINDINGS OF FACT

As was outlined briefly above, the instant matter is a class action suit challenging 24 P.S. § 25-2509.5, the Pennsylvania statute which apportions special education funding.  Specifically, the classes of special education students allege that the funding formula results in an inequitable distribution of special education funds resulting in systemic violations of the IDEA, Section 504 of the Rehabilitation Act, the ADA, and EEOA.  The following constitutes this Court's findings of fact.[2]

### A.    Challenged Funding Formula

1.  In accordance with the IDEA, the Commonwealth of Pennsylvania provides annual supplemental special education funding to school districts in the Commonwealth via a statutory subsidy.  24 P.S. § 25-2509.5.

2.  During the 2009-2010 school year, this supplemental special education funding totaled approximately $1 billion.  (Tr. at 745:2-5; Def. Ex. 91 cell 503N.)

3.  In the 2000-2001 school year, the Commonwealth began implementing a "base/base supplement" formula to appropriate the supplemental special education funding.  24 P.S. § 25-2509.5(bb)-(zz).

4.  The Pennsylvania supplemental special education funding formula consists of four parts: (1) a base amount; (2) a base supplement; (3) an inflation index supplement; and (4) a minimum percentage funding increase.  See generally 24 P.S. § 25-2509.5(mm)-(zz).

---

[2] In making its findings of fact, the Court relied on the testimony elicited at the trial and the exhibits submitted by the parties.  The Court has examined the evidence that has been made part of the record and reflected upon the credibility and reliability of the witness testimony.  Most findings of fact include a citation to the record.  These citations are intended merely as a guide for the reader.  Further, while some findings of fact are based solely upon the record, many are based at least in part upon the reasonable inferences drawn from the record.  To the extent that any of the proposed findings of fact submitted by the parties are inconsistent with findings set forth herein, those proposed findings are rejected.

5.   The base amount is equal to the total amount received by the school district in the prior school year pursuant to the supplemental special education funding formula. See, e.g., 24 P.S. § 25-2509.5(zz)(1).

6.   The base supplement amount is calculated by: (1) multiplying the district's MV/PI ratio by sixteen percent – where sixteen percent represents the average enrollment of special education students across the Commonwealth – of the school district's average daily membership for the prior school year; (2) multiplying the resulting product by the Commonwealth's total available supplemental funding; and (3) dividing that product by the sum of the products of the MV/PI ratio multiplied by sixteen percent of the average daily membership of all school districts for the prior school year. See, e.g., 24 P.S. § 25-2509.5(zz)(2).

7.   The Commonwealth also provides a special education contingency fund, which is used to provide additional support to school districts that have experienced higher levels of need in a given school year.  (Tr. at 743:19-744:7.)

8.   School districts must request contingency funds.  (Tr. at 744:8-11.)

9.   The maximum contingency fund available to each district in the past has always been $150,000.  (Tr. at 255:10-25.)

10.   The Commonwealth's special education subsidy does not include a variable factoring the cost of removing language barriers for special-needs LEP students. 24 P.S. § 25-2509.5.

11.   The Commonwealth's special education subsidy comprises on average approximately 4.8 percent of the total revenue of school districts in the class and 4.0 percent of the total revenue of all school districts.  (Def. Ex. 23; Tr. at 904:1-5.)

13.   As explained by Ralph Girolamo, a school district's special education budget is comprised primarily of the district's basic education funding and local tax effort; the Commonwealth's special education subsidy serves to supplement the special education funds derived from each district's general funds.  (Tr. at 745:10-24.)

13.   There is no state funding specifically earmarked for schools to provide extended school year programming.  (Pl. Ex. 135 at 3.)

14.   The Commonwealth does not collect data on the number of students receiving extended school year services.  (Pl. Ex. 139 at 4.)

    *1.   Assumed Special Needs Population Component*

4

15.   The Commonwealth's special education funding formula assumes that sixteen percent of each school district's average daily membership is a special education student.  (Tr. at 533:9-23.)

16.   The majority of children in the Commonwealth are concentrated in districts with approximately fifteen percent of children classified as having disabilities.  (Tr. at 542:21-543:2.)

17.   The disability rates in school districts ranges from below ten percent up to above twenty-five percent.  (Tr. at 543:2-5.)

18.   The geographic distribution of children with disabilities is not uniform.  (Pl. Ex. 5.)

    2.    *MV/PI Component*

19.   The MV/PI ratio is a calculation used to measure the relative fiscal capacity of a school district to support and maintain its programming.  (Tr. at 740:6:12.)

20.   A high MV/PI ratio indicates a school with less capacity to support itself, whereas a low MV/PI ratio indicates a school is more self sufficient.  (Tr. at 742:4-11.)

21.   The MV/PI ratio is a statutory formula combining the market value aid ratio and the personal income aid ratio.  24. P.S. § 25-2501(14.1).

22.   The MV/PI ratio for each school district is calculated annually.  (Tr. at 740:13-15.)

23.   The MV/PI ratio is designed to provide poorer districts with a greater share of state funding than the share received by richer districts.  (Tr. at 741:2-11.)

24.   Over time, the MV/PI ratio has the effect of allocating an increasingly greater share of funding to school districts with high MV/PI ratios because the base funding level is equal to the total prior year's funding level; as a result, the total special education funding includes each prior year's supplement, which is adjusted for the MV/PI ratio, in addition to the current year's supplement, which is adjusted for the MV/PI ratio.  (Tr. at 741:14-743:2.)

25.   Special education funding per special education pupil is not closely related to a school district's MV/PI ratio.  (Tr. at 576:19-23.)

26.   Although the special education funding formula includes an MV/PI component, that component makes up too small a share of the overall formula to overcome the district's difficulty in raising funding from its local tax base.  (Tr. at 576:19-23.)

**C.**     **Adequacy of Funding**

27.     Plaintiffs' expert, Dr. Bruce Baker evaluated the effect of the Commonwealth's special education funding formula on school districts.

28.     Dr. Baker did not examine individual school budgets.  (Tr. at 680:4-10.)

29.     Dr. Baker did not consider the manner in which individual schools allocated resources in his evaluation.  (Tr. at 680:11-15.)

30.     Dr. Baker did not consider capital expenditures or expenditures incurred on bond and debt funds.  (Tr. at 680:16-19.)

31.     Dr. Baker did not conduct a cost efficiency analysis to evaluate whether districts effectively used their funding.  (Tr. at 680:20-24.)

32.     Dr. Baker did not evaluate any educational programs or services within school districts.  (Tr. at 680:25-681:3.)

33.     Dr. Baker did not evaluate the availability of special education services in and out of the class districts.  (Tr. at 681:4-9.)

34.     Dr. Baker did not consider the relative caseloads of special education teachers.  (Tr. at 681:10-12.)

35.     Dr. Baker did not evaluate the timeliness, rigorousness, or appropriateness of IEPs in and out of the class districts.  (Tr. at 681:13-21.)

36.     Dr. Baker did not evaluate the implementation of IEPs in and out of the class districts.  (Tr. at 681:22-24.)

37.     Dr. Baker did not evaluate the relationship between the receipt of a free appropriate public education ("FAPE") and funding levels.  (Tr. at 682:14-21.)

38.     Dr. Baker did not evaluate the adequacy of services.  (Tr. at 697:6-9.)

    *1.     Benchmarks*

39.     Central to Dr. Baker's analysis of the adequacy of the funding formula was the use of benchmarks to determine proper funding levels.  (Tr. at 563:13-25.)

40.     In developing his benchmarks Dr. Baker relied upon: (1) the Augenblick Palaich studies; and (2) the Special Education Expenditures Project.  (Tr. at 564:1-12.)

a.      *Augenblick Palaich Benchmark*

41.     In 2006, the Pennsylvania State Board of Education commissioned Augenblick Palaich to conduct a study to determine the per pupil cost of educating a student to meet the Commonwealth's academic standards.  (Pl. Ex. 116 at ii.)

42.     The study, published in December 2007, evaluated the base cost of educating a student who had no additional needs, such as special education needs.  (Tr. at 637:22-24.)

43.     The cost estimates in the report are based on the "single goal" of ensuring that "100 percent of students: (1) Master state standards in 12 academic areas; and (2) Score 'proficient' or above on reading and math assessments by the year 2014."  (Pl. Ex. 116 at 3-4.)

44.     The report acknowledges that "no state or country in the developed world has ever achieved" the goal identified in the basic education cost estimate report.  (Pl. Ex. 116 at 57.)

45.     The report concluded that the base cost for meeting the goal set by the report for students without any additional needs was $8,003 per student based on 2005-2006 costs.  (Pl. Ex. 116 at iv.)

46.     The report indicated that the cost of educating a special education student should receive a weight equal to 1.3 times the cost of educating a student with no additional needs, that is, $8,003 plus $8,003 multiplied by 1.3, which would equal $18,406.90, or an added cost of $10,403.90 per special education student above the base cost of that special education student.  (Pl. Ex. 116 at 30, 32-34.)

47.     One benchmark used by Dr. Baker is the Augenblick base weighted by 1.3 times the Augenblick base, as outlined in the preceding paragraph.  The Court will refer to this benchmark as the "Augenblick benchmark."  (Tr. at 561:22-25.)

48.     The 2007 Augenblick special education weight was determined based on prior studies done across the country regarding the added costs required to educate students to meet state and federal performance standards, but did not include Pennsylvania-specific data.  (Pl. Ex. 116 at 9.)

49.     In 2009, a second Augenblick Palaich report was issued to address the costs of special education.  (Pl. Ex. 117 at 3-4.)

50.     The report does not appear to be commissioned by the Pennsylvania State Board of Education, as the 2007 report was, but rather appears to be an advocacy report funded by the Education Law Center, the Disability Rights Network, and The Arc

of Pennsylvania.  (Pl. Ex. 117 at 37.)

51.     The 2009 Augenblick report explained that this added cost did not represent the cost of a "Cadillac" special education, but rather is a cost estimate for the resources needed for a fundamental quality education.  (Pl. Ex. 117 at 8.)

52.     The report does not clearly articulate what is meant by a fundamental quality education or the relationship between what the report defines as a fundamental quality education and the FAPE requirement in the IDEA.

            b.      *Special Education Expenditures Project Benchmark*

53.     The Special Education Expenditures Project ("SEEP") benchmarks were developed by the Center for Special Education Finance.  (Tr. at 564:1-12.)

54.     The study evaluated the average expenditures on special education based on disability types and found that the average additional expenditures per pupil for children with disabilities was approximately double that of average expenditures per pupil for children without disabilities.  (Tr. at 564:9-17.)

55.     Specifically, the Special Education Expenditures Project found that the average spending on a special education student was 90 percent above the average spending on a non-special education student during the 1999-2000 school year, that is, $6,556 spent on a non-special education student plus $6,556 multiplied by 0.9 for a total average spending of $12,525.[3]  (Pl. Ex. 19.)

56.     The SEEP study was not concerned with whether the spending amounts are suitable or whether the spending amounts are sufficient to provide FAPE; it only measures what school districts actually spend on special education programming.  (Tr. at 564:1-565:3.)

57.     Dr. Baker used the 90 percent weight figure to develop a second benchmark, where he applied the 90 percent weight to the 2007 Augenblick base, that is, $8,003, which represents the amount the Augenblick study found should be spent on a student with no special needs, plus $8,003 multiplied by 0.9.  (Tr. at 636:24-637:11.)

58.     One benchmark used by Dr. Baker is the Augenblick base weighted by 0.9 times

_____

[3] These figures are drawn from Plaintiffs' Exhibit 19.  If one were to conduct the calculation based on those figures, one would find that the average total spending was $12,456.40.  It appears that the study rounded the multiplier to the nearest tenth, and the multiplier is in fact 91 percent.

the Augenblick base, as outlined in the preceding paragraph. The Court will refer to this benchmark as the "SEEP benchmark."  (Tr. at 636:24-637:11.)

59.    It is not clear why Dr. Baker elected to use the Augenblick base with the SEEP multiplier to set the SEEP benchmark.

> c.    *Ability to Meet Spending Benchmarks*

60.    The Court does not accept either benchmark provided by Dr. Baker as the amount that must be spent to satisfy the IDEA.

61.    The Court does acknowledge that Dr. Baker's benchmarks may be useful in clarifying the relative spending levels of the class and non-class districts.

> 2.    *Relative Funding Levels*

62.    Dr. Baker found that the average special education subsidy per special education pupil in the class totaled $3,327, and the average special education subsidy per special education pupil in non-class districts totaled $4,108.  (Pl. Ex. 18.)

63.    Dr. Baker found that districts with higher shares of special education students receive systematically less state special education funding per special education child.  (Pl. Ex. 16.)

64.    Because of the manner in which the funding is distributed in Pennsylvania, those schools that have an above-average percentage of their average daily membership enrolled in special education tend to receive less special education funding per special education pupil from the Commonwealth's supplemental special education funding.  (Tr. at 531:3-10.)

65.    Special education funding per special education pupil declines systematically as special education funding rates increase.  (Tr. at 585:11-17.)

66.    Funding from the Commonwealth's special education subsidy accounts for approximately 35 percent to 40 percent of total expenditures on special education in Pennsylvania.  (Tr. at 589:2-9.)

67.    Funding from the Commonwealth's special education subsidy accounts for approximately 37 percent to 39 percent of special education spending by school districts in Class 1.  (Tr. at 589:10-18.)

68.    Funding from the Commonwealth's special education subsidy accounts for approximately 30 percent to 32 percent of special education spending in lower need and higher wealth districts.  (Tr. at 589:10-18.)

69.     The reason that the Commonwealth's special education subsidy accounts for a
        smaller share of non-class special education budgets, is that the budgets are
        significantly less reliant on state funds to support their special education
        programming. (Tr. at 589:19-25.)

    3.      *Educational Outcomes*

70.     Dr. Baker evaluated the educational outcomes of students on IEPs in the class
        districts compared to those students in the non-class districts.

        a.      *Pennsylvania System of School Assessment Scores*

71.     Dr. Baker evaluated the effect of funding on Pennsylvania System of School
        Assessment ("PSSA") scores.  (Pl. Ex. 32.)

72.     PSSAs are state assessments conducted in math and reading.  (Tr. at 580:1-581:9.)

73.     PSSAs do not test life skills, occupational abilities, or speech and language skills,
        although these are goals of special education.  (Tr. at 673:3-14.)

74.     Dr. Baker did not measure student achievement in those areas.  (Tr. at 673:15-17.)

75.     Dr. Baker found that over the course of a five-year mean, the percentage of
        students on IEPs in the class districts is systematically higher than the percentage
        below basic in the non-class districts.  (Tr. at 604:21-605:5.)

76.     Exhibit 32 does not take into account student progress over time.  (Tr. at 672:12-
        19.)

77.     The R squared figure for Plaintiffs' Exhibit 32 indicates that 31 percent of the
        variance in alternative educational placements is explained by the degree to which
        the districts in question fall short of Dr. Baker's spending benchmarks.  (Tr. at
        669:23-670:13.)

78.     Exhibit 104 shows that in 2010, students on IEPs in class districts scored below
        basic on the Math PSSA at higher rates than students on IEPs in non-class
        districts.  (Pl. Ex. 104.)

79.     Exhibit 104 does not take into account student progress over time.  (Tr. at 672:20-
        673:2.)

80.     Exhibit 105 shows that in 2010, students on IEPs in class districts scored below
        basic on the Reading PSSA at higher rates than students on IEPs in non-class
        districts.  (Pl. Ex. 105.)

81.     Exhibit 105 does not take into account student progress over time.  (Tr. at 672:20-673:2.)

> b.     *Alternate Placements*

82.     Plaintiffs' Exhibit 31 compares the percentage of IEP students in alternative educational placements in school districts with more than 5,000 students, in both class and non-class districts.[4]  (Pl. Ex. 31.)

83.     Dr. Baker found that on average 4.3 percent of special education students in class districts with more than 5,000 students are placed in alternative educational placements, while on average 1.4 percent of special education students in non-class districts with more than 5,000 students are placed in alternative educational placements.  (Pl. Ex. 31.)

84.     There appear to be approximately twelve class districts represented on Dr. Baker's chart.  (Pl. Ex. 31.)

85.     All but two of those class districts fall somewhere between zero and five percent of students placed in alternative educational placements.  (Pl. Ex. 31.)

86.     Only two class districts appear to fall above five percent: The Reading School District appears to fall just barely above five percent, whereas the Harrisburg City School District falls above fifteen percent.  (Pl. Ex. 31.)

---

[4] Plaintiffs' Exhibit 31 suffers from a lack of clarity in several respects.  Many points on the graph are clustered closely together making it difficult to determine how many districts are represented on the graph.  This is even more difficult with respect to the class districts given that in addition to providing "dots" to represent the district, the graph includes text indicating which district is represented, which in turn results in a number of points on the graph being almost completely obscured.  The vertical axis only indicates where zero, five, ten, and fifteen percent fall on the vertical axis.  Further, the graph does not include grid lines to aid the Court in determining where each point falls along the vertical axis.

In addition, Plaintiffs do not appear to have included a chart listing the raw numbers of children in alternative education programs, rendering it nearly impossible for the Court to fairly interpret the data.  For example, the lack of raw data makes it impossible for the Court to determine the extent to which the Harrisburg City School District's rate of alternative education placements inflates the numbers for the class district.

Finally, the chart does not indicate precisely how alternative education is defined.

Accordingly, the exhibit permits the Court to guess at what the chart shows, but does not permit the Court to make any precise determinations regarding the alternative education placements of special education students in class districts.

87.     The R squared figure for Plaintiffs' Exhibit 31 indicates that 11.27 percent of the variance in alternative educational placements is explained by the degree to which the districts in question fall short of Dr. Baker's spending benchmarks.  (Tr. at 669:23-670:13.)

88.     Dr. Baker evaluated the rates of students with disabilities being suspended for more than ten days in class and non-class districts.  (Tr. at 604:6-14.)

89.     The percentage of suspensions lasting more than ten days for students with disabilities was 1.5 percent for students not in the class in the 2007-2008 school year.  (Pl. Ex. 65.)

90.     The percentage of suspensions lasting more than ten days for students with disabilities was 3.7 percent for students in the class in the 2007-2008 school year.  (Pl. Ex. 65.)

91.     Dr. Baker did not present data on suspensions for any other school years.

92.     Dr. Baker did not present any data regarding how much of the variance in long-term suspension rates is caused by the challenged funding formula.

93.     Dr. Baker reviewed some data regarding the intersection of LEP students and students on IEPs, but he was only able to draw a preliminary conclusion regarding that data before he was ordered to delete it.[5]  (Tr. at 626:3-12.)

        c.      *Graduation Rates*

94.     Dr. Baker evaluated the graduation rates compared to dropout rates of IEP students.  (Tr. at 610:16-18.)

95.     Dr. Baker found that in districts with greater funding gaps relative to the Augenblick and SEEP benchmarks the ratio of dropouts to graduates among special education students is higher compared to those districts with lower funding gaps compared to those benchmarks.  (Tr. at 610:24-611:5.)

---

[5] Dr. Baker's preliminary conclusion was that there appeared to be systematically higher rates of restrictive placements for students who were both LEP and on IEPs.  His testimony appeared to suggest that these systematically higher placements occurred across all districts in the Commonwealth and in the class districts in particular.  (Tr. at 626:6-12.)  Ultimately, the Court is concerned with the reliability of preliminary findings, especially when, as here, the Court has not been provided with the findings themselves to review and when those findings have not clearly been linked to the funding formula being challenged.  The Court will, accordingly, disregard this particular statement.

96.     The funding gap between the Augenblick and SEEP benchmarks and actual district spending explains approximately twenty percent of the variation in dropouts to graduates.  (Tr. at 611:19-24.)

97.     Dropout-to-graduation ratios vary widely within class districts and within non-class districts.  (Tr. at 612:5-9.)

98.     Exhibit 37 suggests that a class district had the highest dropout-to-graduation ratio and another class district had the lowest dropout-to-graduation ratio.  (Pl. Ex. 37.)

99.     Dr. Baker did not provide information regarding average dropout ratios for IEP students in class and non-class districts.

100.    Defendant's Exhibit 27 identifies the special graduation rate for each school district in the Commonwealth as collected by the federal Office for Special Education Programs.  (Tr. at 838:23-839:14.)

101.    As of July 2010, fifteen class districts had a 100 percent graduation rate for special education students.  (Def. Ex. 27.)

102.    As of July 2010, eleven class districts had graduation rates of at least 90 percent but less than 100 percent for special education students.  (Def. Ex. 27.)

103.    As of July 2010, twenty-two class districts had graduation rates of at least 80 percent but less than 90 percent for special education students.  (Def. Ex. 27.)

104.    As of July 2010, seventeen class districts had graduation rates of at least 70 percent but less than 80 percent for special education students.  (Def. Ex. 27.)

105.    As of July 2010, six class districts had graduation rates of at least 60 percent but less than 70 percent for special education students.  (Def. Ex. 27.)

106.    As of July 2010, three class districts had graduation rates below 60 percent for special education students.  (Def. Ex. 27.)

107.    As of July 2010, the average reported graduation rate in each non-class district was 88.65 percent.  (Def. Ex. 27.)

108.    As of July 2010, the average reported graduation rate in each class district was 81.55 percent.  (Def. Ex. 27.)

    d.      *Highly Qualified Teachers*

109.   On average, 96.8 percent of special education sections in class school districts are taught by highly qualified teachers.  (Pl. Ex. 18.)

110.   On average, 97.3 percent of special education sections in all Pennsylvania school districts are taught by highly qualified teachers.  (Pl. Ex. 18.)

**B.   English Language Learners**

111.   More than seventy different languages are spoken in Pennsylvania schools.  (Tr. at 976:23-977:4.)

112.   LEP students suspected of qualifying for special education should be assessed in their native language.  (Tr. at 342:23-343:3.)

113.   All evidence produced at trial suggests that students were assessed in their native languages.

114.   All evidence produced at trial suggests that translators were available for all IEP meetings.

115.   All evidence produced at trial suggests that all documents were provided to parents in their preferred language or translators were provided to explain the contents of documents that were not in the parents' preferred language.

116.   Some teachers who testified at trial testified to having difficulty communicating with LEP students in their special education classes.  (Tr. at 316:7-318:4.)

117.   Teachers do not need to be bilingual to effectively educate LEP students in English acquisition or in core academic subjects.  (Tr. at 981:20-984:7.)

118.   Cultural competence is the most important factor in ESL instruction.  (Tr. at 974:8-11.)

119.   A teacher need not be bilingual to be culturally competent.  (Tr. at 975:6-8.)

120.   Pennsylvania schools implement a variety of ESL instruction, and LEP students are able to receive an effective education within a variety of different programs.  (Tr. at 973:3-974:5.)

**D.   School Districts**

*1.   Reading School District*

121.   Plaintiffs have failed to produce evidence from which the Court is able to

conclude that the Reading School District is a member of the class of schools with a 17 percent special education population and an MV/PI ratio of 0.65 or greater, and the evidence it did produce suggests Reading was not in the class in the 2007-2008, 2008-2009, or 2009-2010 school years.[6]

122.    In the 2009-2010 school year LEP students comprised 19.98 percent of the average daily membership of the Reading School District.  (Def. Ex. 91 at 7.)

123.    In the 2007-2008 school year 17.1 percent of special education students were proficient in reading compared to a statewide average of 31.1 percent.  (Pl. Ex.

---

[6] Regarding class one, those districts having a 17 percent or higher enrolled population of special-needs students and an MV/PI ratio of 0.65 or greater, the Court finds no evidence that 17 percent of students are special-needs students.  Plaintiffs have produced annual reports for the 2007-2008, 2008-2009, and 2009-2010 school years.  (Pl. Ex. 155-157.)  Those reports indicate that in the 2007-2008 school year 12.7 percent of the student population was enrolled in special education (Pl. Ex. 157), in the 2008-2009 school year 14.4 percent of the student population was enrolled in special education (Pl. Ex. 156), and in the 2009-2010 school year 16.7 percent of the student population was enrolled in special education (Pl. Ex. 155).  The figures listed in these reports are identical to the figures listed in Defendants' exhibits.  (Def. Ex. 87-88.)

In support of their theory that the Reading School District ever had more than 17 percent of its average daily membership classified as special needs, Plaintiffs contend that in the 2008-2009 school year the district under reported the number of special education students.  They cite a letter written by Susan Schultz on September 26, 2008, in which she states that the total number of special education students, including gifted, is 4,186.  (Pl. Ex. 186.)  They further cite a figure from a chart in which the total gifted population is listed at 934 for the 2008-2009 school year.  (Pl. Ex. 187-188.)  They then apparently subtract the 934 number from the 4,186 number to arrive at a figure of 3,252 students.  (Doc. No. 276 ¶ 147.)  Plaintiffs then divide that figure by the child count the district provided on December 1, 2008, to conclude 18.28 percent of the population is special needs.  (Id.)

Plaintiffs' calculation is rife with error.  First, the 4,186 figure was given as of September 26, 2008.  (Pl. Ex. 186.)  The total population is given based on a December 1, 2008 child count.  (Pl. Ex. 156.)  It is entirely unclear when the district determined there were 934 gifted students.  Further, the data in which the district identifies 934 gifted students identifies only 4,044 special education students in total, not 4,186 as Plaintiffs originally suggest.  (Pl. Ex. 187.)  To that end, the total number of special education students is 142 students less than Mrs. Schultz's figure, and by necessity Plaintiffs' calculation of special-needs special education students is 142 students too high.  Further, Plaintiffs never explain whence the figures identified in Exhibits 186-188 are derived, when they were counted, or what the total student population is when they were counted.  Nor does Mrs. Schultz ever explain why she believes the district was under reporting the students with IEPs or explain to the Court why it should accept that assertion over the district's official statistics.  Accordingly, the Court will accept the statistics listed in Plaintiffs' exhibits 155-157 and disregard Plaintiffs' alternative figure.

157.)

124.    In the 2008-2009 school year 16.9 percent of special education students were proficient in reading compared to a statewide average of 32.7 percent.  (Pl. Ex. 156.)

125.    In the 2009-2010  school year 19.7 percent of special education students were proficient in reading compared to a statewide average of 35.3 percent.  (Pl. Ex. 155.)

126.    In the 2007-2008 school year 25.9 percent of special education students were proficient in math compared to a statewide average of 36.1 percent.  (Pl. Ex. 157.)

127.    In the 2008-2009 school year 29.1 percent of special education students were proficient in math compared to a statewide average of 38.9 percent.  (Pl. Ex. 156.)

128.    In the 2009-2010 school year 39.9 percent of special education students were proficient in math compared to a statewide average of 45.7 percent.  (Pl. Ex. 155.)

129.    The number of special education students who spent at least 80 percent of their time in regular education classes in the 2007-2008 school year was 45.3 percent in Reading compared to 53 percent statewide.  (Pl. Ex. 157.)

130.    The number of special education students who spent at least 80 percent of their time in regular education classes in the 2008-2009 school year it was 50.9 percent in Reading compared to 55.3 percent statewide (Pl. Ex. 156.)

131.    The number of special education students who spent at least 80 percent of their time in regular education classes in the 2009-2010 school year it was 51.7 percent in Reading compared to 57.8 percent statewide.  (Pl. Ex. 155.)

132.    A staff member whose salary was divided evenly between the special education budget and the bilingual education budget coordinated the interpreters for IEP meetings and at times conducted the translation herself.  That staff member also translated some IEPs and arranged for the remainder of the IEPs to be translated by an individual who was not employed by the school district.  (Tr. at 516:1-8.)

133.    A translator attends every IEP meeting involving non-English speaking parents. (Tr. at 510:20-24.)

134.    IEP documents are translated into Spanish, and those portions not in Spanish are translated at the IEP meeting.  (Tr. at 511:3-17.)

135.    Parents sign a Notice of Recommended Educational Placement ("NOREP")

during every IEP meeting, which explains the reason the meeting is being held. (Tr. at 511:19-25.)

136.   Mrs. Shultz, the Director of Special Education for Reading School District, believes that there are no problems with over- or under-identification of special education students.  (Tr. at 509:17-510:3.)

137.   Mrs. Shultz conducts random spot checks of IEPs developed in the district.  (Tr. at 518:20-519:7.)

138.   All IEPs reviewed by Mrs. Shultz were written to provide a meaningful educational benefit.  (Tr. at 515:8-11.)

139.   All IEPs reviewed by Mrs. Shultz  were implemented as written.  (Tr. at 515:12-13.)

140.   The Reading School District provides notices of procedural safeguards in both Spanish and English at each due process hearing, in each school building office, in the local newspaper, at the Reading Opportunity Center for Children, and at yearly workshops hosted by the district.  (Tr. at 512:18-513:13; 517:2-17.)

141.   A majority of special education students spend at least part of their time in general education classes.  (Tr. at 513:14-514:7.)

142.   The Reading School District offered 300 special education students extended school year services during the summer of 2011, and 265 students took advantage of the extended school year program.  (Tr. at 494:11:18.)

143.   English language acquisition certified special education teachers are located in ten of the twenty one school buildings in the school district.  In addition, two special education teachers are fluent in Spanish and many more have an understanding of Spanish but are not fluent.  (Tr. at 482:1-9; 483:5-9.)

144.   At least thirty percent of school counselors are bilingual.  (Tr. at 495:6-7.)

145.   There are approximately eight classrooms in the district that are "self-contained," that is, classrooms where students receive all of their subject matter areas in a single classroom setting.  (Tr. at 475:3-6.)

146.   There are four behavior specialists in the Reading School District, none of whom are bilingual.  (Tr. at 479:2-7, 480:5-6.)

147.   Every building in the Reading School District has at least one English language acquisition teacher.  (Tr. at 489:15-23.)

148.    Both regular education and special education LEP students are on the caseload of an English language acquisition teacher who collaborates with the students' teachers to provide support to the students in question.  (Tr. at 489:15-490:2.)

149.    All academic material is modified for LEP students for both special education and regular education students.  (Tr. at 486:10-22.)

150.    Mrs. Shultz was prohibited from using funds to train translators; however, that was not because funds were unavailable, but rather because the board did not approve of using the funding for those purposes.  (Tr. at 516:21-24.)

151.    Reading could not offer higher salaries to bilingual teachers and paraprofessionals because the collective bargaining agreement bars such salary adjustments.  (Tr. at 505:9-23.)

152.    At one point three special education teachers were under emergency certifications.[7]   (Tr. at 481:16-20.)

153.    There was a time when there were not enough speech pathologists, but it is unclear how far in the past that was, why there were insufficient speech pathologists, what the shortfall of speech pathologists was, and how long the shortfall lasted.  The school district did apparently correct the situation with compensatory education.  (Tr. at 501-503.)

154.    All Due Process complaints against the Reading School District filed in the past three years were settled prior to adjudication of the complaint.  (Tr. at 500:12-22.)

    2.    *Lancaster School District*

155.    In the 2007-2008 school year the Lancaster School District had a total enrollment of 11,591 students, 19.2 percent of whom were special education students.  (Pl. Ex. 151.)

156.    In the 2008-2009 school year the Lancaster School District had a total enrollment of 11,351 students, 19.2 percent of whom were special education students.  (Pl. Ex. 150.)

157.    In the 2009-2010 school year the Lancaster School District had a total enrollment of 11,230 students, 18.3 percent of whom were special education students.  (Pl.

---

[7] No evidence was introduced from which the Court could determine what an "emergency certification" is, whether an emergency certification is at all problematic, or what the cause of the emergency certification was.

Ex. 149.)

158.   In 2011 approximately 2,300 LEP students were enrolled in the Lancaster School District, about 500 of whom are both LEP and special education students.  (Tr. at 1027:21-1028:20.)

159.   In the 2007-2008 school year 15.1 percent of special education students were proficient in reading compared to a statewide average of 31.1 percent.  (Pl. Ex. 151.)

160.   In the 2008-2009 school year 14.8 percent of special education students were proficient in reading compared to a statewide average of 32.7 percent.  (Pl. Ex. 150.)

161.   In the 2009-2010  school year 14.7 percent of special education students were proficient in reading compared to a statewide average of 35.3 percent.  (Pl. Ex. 151.)

162.   In the 2007-2008 school year 20.5 percent of special education students were proficient in math compared to a statewide average of 36.1 percent.  (Pl. Ex. 151.)

163.   In the 2008-2009 school year 22.3 percent of special education students were proficient in math compared to a statewide average of 38.9 percent.  (Pl. Ex. 150.)

164.   In the 2009-2010 school year 22.8 percent of special education students were proficient in math compared to a statewide average of 45.7 percent.  (Pl. Ex. 149.)

165.   The number of special education students who spent at least 80 percent of their time in regular education classes in the 2007-2008 school year totaled 63.3 percent compared to a statewide average of 53.0 percent.  (Pl. Ex. 151.)

166.   The number of special education students who spent at least 80 percent of their time in regular education classes in the 2008-2009 school year totaled 60.0 percent compared to a statewide average of 55.3 percent.  (Pl. Ex. 150.)

167.   The number of special education students who spent at least 80 percent of their time in regular education classes in the 2009-2010 school year totaled 59.7 percent compared to a statewide average of 57.8 percent.  (Pl. Ex. 149.)

168.   At the time of trial, Carole Clancy was beginning her third year as the supervising coordinator for special education for the Lancaster School District.  (Tr. at 1018:1-4.)

169.   Mrs. Clancy reviews every IEP that comes into the district for any high school

student and most of the middle and elementary school students for services.  (Tr. at 1021:16-25.)

170.    The IEPs reviewed by Mrs. Clancy are written to meet the needs of the special education students and provide them with an educational benefit.  (Tr. at 1022:2-8.)

171.    Mrs. Clancy testified that in her experience as special education coordinator, the IEPs in Lancaster School District are being implemented.  (1022:9-13.)

172.    Parents are advised of procedural safeguards at least at the annual IEP meeting. (Tr. at 1022:14-21.)

173.    Only two due process requests were filed during Mrs. Clancy's time as special education coordinator, both of which were resolved before hearings were held. (Tr. at 1023:6-13.)

174.    There has never been a circumstance in which the person with fiscal responsibility has ever rejected a service supported by the rest of the IEP team. (Tr. at 1024:14-18.)

175.    Lancaster School District has four bilingual special education teachers and eight bilingual para-educators and personal care assistants.  (Tr. at 1029:7-15.)

176.    Recent budget cuts have had no impact on the special education services provided by the Lancaster School District.  (Tr. at 1030:3-12.)

177.    Scott Richardson taught in the Lancaster School District from 1999 through 2007. (Tr. at 309:7-8.)

178.    There is no evidence that the Lancaster School District had a special education population above seventeen percent of the average daily membership in any of the years that Dr. Richardson taught in the Lancaster School District.

179.    There is no evidence that the Lancaster School District had an LEP population above ten percent of the average daily membership in any of the years that Dr. Richardson taught in the Lancaster School District.

180.    For four years during Dr. Richardson's tenure in the Lancaster School District he taught a life skills class for approximately eight to twelve students with the assistance of a full time aide.  (Tr. at 310:1-5; 311:16-23.)

181.    Dr. Richardson requested additional support to assist with one particularly difficult student, but he did not receive that support for unspecified reasons.  (Tr.

at 312:24-313:4.)

182.   Dr. Richardson was not provided with a translator to communicate with LEP students.  (Tr. at 317:4-6.)

183.   Dr. Richardson was not given sufficient funds to purchase groceries when the students went to the grocery store.  (Tr. at 320:9-321:2.)

184.   Dr. Richardson was provided with funds to purchase manipulatives and consumables, but Dr. Richardson found the funds to be inadequate.  (Tr. at 315:8-11.)

185.   Dr. Richardson was not given permission to include extended school years on IEPs for certain students.  (Tr. at 321:15-21.)

186.   Cindy Dittman teaches in a learning support classroom with the assistance of one aide.  Last year she had approximately ten students with a range of disabilities including autism, mental retardation, and emotional needs.  (Tr. at 60:13-61:7.)

187.   All of Mrs. Dittman's students who needed speech and language services received it, although Mrs. Dittman would have preferred they receive those services at greater frequencies.  (Tr. at 77:15-17.)

188.   Mrs. Dittman requested a personal care assistant for an autistic student, but she did not receive a response to that request.  (Tr. at 81:15-22.)

189.   Mrs. Dittman requested itinerant support for some students in her second grade class, but the request was denied.  (Tr. at 77:1-10.)

190.   Mrs. Dittman attempted to have students with severe behavior problems moved to an emotional support classroom, but that request was denied by her supervisor. (Tr. at 75:1-12.)

191.   While her school was undergoing renovations, Mrs. Dittman taught in a small classroom; however, with renovations completed she is satisfied with her special education classroom. (Tr. at 83:14-19.)

192.   In Mrs. Dittman's experience, the Lancaster School District does a good job identifying students with special education needs.  (Tr. at 89:17-19.)

193.   All students of whom Mrs. Dittman is aware who have IEPs are having their IEPs implemented.  (Tr. at 90:6-10.)

194.   There was a time that LEP students were not seen by an ESL teacher for part of

the year; however, as of last year the ESL program was running smoothly.  (Tr. at 97:9-13.)

195.    The Lancaster School District provides translators to parents who are not proficient in English so the parents can participate in the IEP team.  (Tr. at 1020:10-13.)

196.    In the summer of 2011 approximately 50 students participated in extended school year programming.  (Tr. at 1028:2-6.)

   *3.    York School District*

197.    In the 2007-2008 school year the York City School District had a total enrollment of 5,343 students, 28.5 percent of whom were special education students.  (Pl. Ex. 160.)

198.    In the 2008-2009 school year the York City School District had a total enrollment of 5,966 students, 26.3 percent of whom were special education students.  (Pl. Ex. 159.)

199.    In the 2009-2010 school year the York City School District had a total enrollment of 6,255 students, 22.6 percent of whom were special education students.  (Pl. Ex. 158.)

200.    As of September 25, 2008, approximately 1,369 LEP students were enrolled in the York School District, approximately 252 of whom are both LEP and special education.  (Pl. Ex. 185 at 1.)

201.    In the 2007-2008 school year 14.6 percent of special education students were proficient in reading compared to a statewide average of 31.1 percent.  (Pl. Ex. 160.)

202.    In the 2008-2009 school year 21.9 percent of special education students were proficient in reading compared to a statewide average of 32.7 percent.  (Pl. Ex. 159.)

203.    In the 2009-2010  school year 23.9 percent of special education students were proficient in reading compared to a statewide average of 35.3 percent.  (Pl. Ex. 158.)

204.    In the 2007-2008 school year 23.1 percent of special education students were proficient in math compared to a statewide average of 36.1 percent.  (Pl. Ex. 160.)

205.    In the 2008-2009 school year 30.5 percent of special education students were

proficient in math compared to a statewide average of 38.9 percent.  (Pl. Ex. 159.)

206.    In the 2009-2010 school year 33.8 percent of special education students were proficient in math compared to a statewide average of 45.7 percent.  (Pl. Ex. 158.)

207.    The number of special education students who spent at least 80 percent of their time in regular education classes in the 2007-2008 school year totaled 40.8 percent compared to a statewide average of 53.0 percent.  (Pl. Ex. 160.)

208.    The number of special education students who spent at least 80 percent of their time in regular education classes in the 2008-2009 school year totaled 42.6 percent compared to a statewide average of 55.3 percent.  (Pl. Ex. 159.)

209.    The number of special education students who spent at least 80 percent of their time in regular education classes in the 2009-2010 school year totaled 38.0 percent compared to a statewide average of 57.8 percent.  (Pl. Ex. 158.)

210.    At the start of trial Linda Brown was beginning her fourth year as the director of special education for the York City School District.  (Tr. at 937:1-6.)

211.    Based on her evaluations of IEPs, Dr. Brown has found that the IEPs are addressing the needs of the students.  (Tr. at 947:15-20.)

212.    Based on her evaluations of IEPs, Dr. Brown has found that the IEPs are being implemented.  (Tr. 948:11-15.)

213.    Funding is never a consideration in determining whether to provide a service. (Tr. at 948:16-24.)

214.    Parents are provided with notices of procedural safeguards at every IEP meeting and are available in English and Spanish online.  (Tr. at 949:21-950:13.)

215.    In the last three years, the York City School District has mediated two disputes with parents.  (Tr. at 950:18-951:8.)

216.    There have been no due process hearings since Dr. Brown became director of special education.  (Tr. at 951:3-6.)

217.    Bruce Riek has been an emotional support instructor in the York City School District for eleven years.  (Tr. at 100:20-101:6.)

218.    Mr. Riek had to "beg" for some materials, but he was never short of any special education supplies.  (Tr. at 114:11-16.)

219.    Mr. Riek has never personally been denied a request for supplies for his classroom.  (Tr. at 115:18-23.)

220.    When Mr. Riek served as an itinerant teacher he recommended that a student be moved to another placement, but that request was denied.  (Tr. at 106:4-107:9.)

221.    All of the students taught by Mr. Riek have had their IEPs implemented.  (Tr. at 108:24-109:2.)

222.    At the time of trial, Mr. Riek was aware of one therapeutic emotional support class where the aide was out on medical leave and had not yet been replaced, and a fifth and a sixth grade emotional support class, comprised of ten and twelve students respectively, in which one teacher taught each class without the benefit of an aide.  (Tr. at 102:3-16.)

223.    One special education teacher is bilingual in English and Spanish.  (Pl. Ex. 185 at 2.)

224.    Interpreters are provided to non-English speaking parents so they can participate in IEP team meetings.  (Tr. at 942:15-20.)

225.    Spanish-speaking students are evaluated in Spanish by a Spanish-speaking instructor.  (Tr. at 952:8-17.)

226.    In the summer of 2011, approximately thirty to forty students attended extended school year programming.  (Tr. at 961:18-22.)

        *4.    Allentown School District*

227.    In the 2007-2008 school year the Allentown School District had a total enrollment of 17,892 students, 14.3 percent of whom were special education students.  (Pl. Ex. 148.)

227.    In the 2008-2009 school year the Allentown School District had a total enrollment of 17,786 students, 14.2  percent of whom were special education students.  (Pl. Ex. 147.)

228.    In the 2009-2010 school year the Allentown School District had a total enrollment of 18,752 students, 13.6 percent of whom were special education students.  (Pl. Ex. 146.)

229.    In the 2009-2010 school year the Allentown School District had an LEP population totaling 10.73 percent of the average daily membership.  (Def. Ex. 91.)

230.    In the 2007-2008 school year 16.2 percent of special education students were proficient in reading compared to a statewide average of 31.1 percent. (Pl. Ex. 148.)

231.    In the 2008-2009 school year 18.5 percent of special education students were proficient in reading compared to a statewide average of 32.7 percent. (Pl. Ex. 147.)

232.    In the 2009-2010 school year 17.8 percent of special education students were proficient in reading compared to a statewide average of 35.3 percent. (Pl. Ex. 146.)

233.    In the 2007-2008 school year 24.3 percent of special education students were proficient in math compared to a statewide average of 36.1 percent. (Pl. Ex. 148.)

234.    In the 2008-2009 school year 27.5 percent of special education students were proficient in math compared to a statewide average of 38.9 percent. (Pl. Ex. 147.)

235.    In the 2009-2010 school year 29.6 percent of special education students were proficient in math compared to a statewide average of 45.7 percent. (Pl. Ex. 146.)

236.    The number of special education students who spent at least 80 percent of their time in regular education classes in the 2007-2008 school year totaled 49.4 percent compared to a statewide average of 53.0 percent. (Pl. Ex. 148.)

237.    The number of special education students who spent at least 80 percent of their time in regular education classes in the 2008-2009 school year totaled 49.3 percent compared to a statewide average of 55.3 percent. (Pl. Ex. 147.)

238.    The number of special education students who spent at least 80 percent of their time in regular education classes in the 2009-2010 school year totaled 55.5 percent compared to a statewide average of 57.8 percent. (Pl. Ex. 146.)

239.    Deborah Hartman has been the director of special education for the Allentown School District since 2003, and was the assistant director of special education in Allentown for the nine years prior to that. (Tr. at 248:25-249:8.)

240.    One of Allentown's special education teachers is ESL certified and there are four bilingual/bicultural special education teachers. (Tr. at 287:1-6.)

241.    The Allentown School District provides a teacher and two para-professionals to staff full-time autistic support classes, which are capped at a maximum of eight students. (Tr. at 257:20-258:2.)

242.   Disabled students may also receive one-to-one support from a personal care assistant.  (Tr. at 258:22-260:4.)

243.   The Allentown School District provides an itinerant vision support teacher, an assistant skilled in braille and brailling services, and other support to visually impaired students.  (Tr. at 261:4-23.)

244.   The Allentown District also provides itinerant support teachers who provide direct support as well as indirect support such as coaching teachers and paraprofessionals and producing materials to assist students with sensory hearing impairments.  The Allentown School District also provides classroom acoustical accommodations for the students.  (Tr. at 263:10-264:7.)

245.   The Allentown School District provides a full continuum of support services to emotional support students including itinerant, supplemental, and full-time support, as well as behavioral specialists, mental health support services, psychiatric services at the schools, and therapeutic staff members.  (Tr. at 264:13-21.)

246.   The Allentown School District offers five multi-disability support classrooms with a maximum of eight students staffed by one teacher and two paraprofessionals in addition to any one-on-one continuous support such as nurses or personal care assistants that the muti-disability students require.  (Tr. at 270:1-16.)

247.   The Allentown School District does not consider funding when determining what services to provide a student.  (Tr. at 296:17-297:1.)

    *5.    Harrisburg School District*

248.   In the 2007-2008 school year the Harrisburg City School District had a total enrollment of 8,391 students, 20.3 percent of whom were special education students.  (Pl. Ex. 163.)

249.   In the 2008-2009 school year the Harrisburg City School District had a total enrollment of 8,306 students, 20.3 percent of whom were special education students.  (Pl. Ex. 162.)

250.   In the 2009-2010 school year the Harrisburg City School District had a total enrollment of 8,144 students, 21.0 percent of whom were special education students.  (Pl. Ex. 161.)

251.   In the 2007-2008 school year 8.8 percent of special education students were proficient in reading compared to a statewide average of 31.1 percent.  (Pl. Ex.

163.)

252.     In the 2008-2009 school year 13.8 percent of special education students were proficient in reading compared to a statewide average of 32.7 percent.  (Pl. Ex. 162.)

253.     In the 2009-2010 school year 18.6 percent of special education students were proficient in reading compared to a statewide average of 35.3 percent.  (Pl. Ex. 161.)

254.     In the 2007-2008 school year 9.7 percent of special education students were proficient in math compared to a statewide average of 36.1 percent.  (Pl. Ex. 163.)

255.     In the 2008-2009 school year 14.3 percent of special education students were proficient in math compared to a statewide average of 38.9 percent.  (Pl. Ex. 162.)

256.     In the 2009-2010 school year 21.6 percent of special education students were proficient in math compared to a statewide average of 45.7 percent.  (Pl. Ex. 161.)

257.     The number of special education students who spent at least 80 percent of their time in regular education classes in the 2007-2008 school year totaled 45.7 percent compared to a statewide average of 53.0 percent.  (Pl. Ex. 163.)

258.     The number of special education students who spent at least 80 percent of their time in regular education classes in the 2008-2009 school year totaled 50.8 percent compared to a statewide average of 55.3 percent.  (Pl. Ex. 162.)

259.     The number of special education students who spent at least 80 percent of their time in regular education classes in the 2009-2010 school year totaled 52.9 percent compared to a statewide average of 57.8 percent.  (Pl. Ex. 146.)

260.     Amy Cytryn has taught special education in the Harrisburg School District for nine years.  (Tr. at 117:7-19.)

261.     All of Mrs. Cytryn's students have an IEP that is being implemented.  (Tr. at 136:8-15.)

262.     Mrs. Cytryn is not aware of any of her students who have requested a due process hearing or filed a complaint with the Department of Education.  (Tr. at 136:16-25.)

263.     In the past Mrs. Cytryn has had an unlimited ability to request a chartered or rented bus to conduct community-based instruction for her autism and life skills classes, but beginning in the 2010-2011 school year would need to walk or take

public transportation to conduct community-based instruction.  (Tr. at 119:4-121:4.)

264.    Mrs. Cytryn's classroom has a full kitchen, including a refrigerator and a stove.  (Tr. at 121:20-21.)

265.    In the past the school gave her $50 per month to be used to take her class to a store to purchase food and then prepare it; however, beginning with the current school year her food budget has been limited to $20.  (Tr. at 122:5-11.)

266.    Mrs. Cytryn has twelve students in her class.  (Tr. at 122:21-22.)

267.    When Mrs. Cytryn first started nine years ago she had two paraprofessionals, but in the current school year she only has one paraprofessional assigned to the entire class and one who is assigned just to a single student to provide one-to-one support for that student.  (Tr. at 123:12-21.)

**E.      Named Plaintiffs**

        *1.      Debora R.*

268.    Debora is a student with disabilities who attends school in the Reading School District.  (Tr. at 380-387.)

269.    Prior to enrolling in the Reading School District at the age of eleven, Debora attended school in the New York City School District in New York where she received special education services.  (Tr. 826:1-7.)

270.    Debora has significant disabilities stemming from a brain injury at birth, which has had a negative impact on her fine motor skills, gross motor skills, balance, and cognitive ability.  (Tr. at 383.)

271.    Debora's disabilities include mental retardation, speech and language difficulties, and physical limitations.  (Tr. at 874:25-875:1-12.)

272.    When Debora entered the Reading School District at age eleven she had an IEP from the New York City School District.  (Tr. at 826:1-7.)

273.    The New York City School District provided Debora with physical therapy and speech and language services.  (Tr. at 826:7-10.)

274.    The Reading School District continued to provide physical therapy and speech and language services to Debora, and began providing a personal care aide, adapted physical education, and transportation services.  (Tr. at 457:10-13; 826:9-

827:4.)

275.  The Reading School District provides Debora with a Spanish speaking assistant. (Tr. at 461:6-7.)

276.  Since enrolling in the Reading School District, Debora's IEP team has met at least once per year.  (Tr. at 462:4-5.)

277.  Mrs. Delcy,[8] Deborah's mother, was invited to attend each IEP team meeting. (Pl. Ex. 197 at 12-13, 47-48, 65, 69, 72, 88, 89, 161-164.)

278.  Mrs. Delcy has attended IEP meetings.  (Tr. at 461:24-25.)

279.  A translator has always been present at the IEP meetings.  (Tr. at 462:2-3.)

280.  Debora's IEP included measurable annual goals.  (Pl. Ex.197:33-36, 57-62, 79-85, 100-07, 139-46, 153-60, 167-92, 204-07, 213-16.)

281.  Debora's IEPs provided for an extended school year and included various related services such as specialized transportation, a personal care assistant, adaptive physical education, physical therapy consultations, occupational therapy consultations, and speech and language pathology/therapy.  (Pl. Ex. 197 at 63-64, 86-87, 108-09, 147-48, 208-09.)

282.  Over time the frequency of certain related services provided to Debora decreased: monthly physical therapy consultations decreased to quarterly consultations; twice weekly speech and language pathology/therapy sessions decreased to weekly sessions; and "as needed" occupational therapy consultations decreased to annual consultations.  (Pl. Ex. 197 at 63-64, 86-87, 108-09, 147-48, 208-09.)

283.  Dr. Nicodemus testified that a once-per year consultation for occupational therapy may be appropriate; however, he further testified that "I would think that a more appropriate recommendation would be consult as needed."  (Tr. at 385:23-386:2.)

284.  Mrs. Delcy signed NOREPs approving of Debora's educational program and placement.  (Pl. Ex. 197 at 43-46, 66-67, 70-71, 91-92.)

285.  The Reading School District provided some documents to Mrs. Delcy in Spanish, which is her native language, and others in English.  (Tr. at 463:13-14.)

---

[8] To protect anonymity, the children's parents are referred to by their first name.  For example, Deborah's mother's first name is Delcy, so she is referred to as "Mrs. Delcy."

29

286.    The Reading School District provided a notice of procedural safeguards, which Mrs. Delcy signed, in Spanish.  (Tr. 464:11-22.)

287.    Mrs. Delcy never filed a formal complaint with the Department of Education regarding Debora's education.  (Tr. at 467:10-16.)

288.    Mrs. Delcy never asked for a due process hearing in connection with Debora's IEP or implementation of the IEP.  (Tr. at 465: 22-24.)

289.    Debora is supposed to be picked up in front of her home, but at various times the school sent a bus to pick her up approximately one block from her home.  (Tr. at 458:11-14.)

290.    Because of Debora's physical limitations, as well as her mother's challenges, Debora missed a significant amount of school as a result of the bus not coming directly to Debora's home.  (Tr. at 457-459.)

291.    Mrs. Delcy testified, however, that she raised these concerns to the director of special education and the bus now picks up her daughter in front of the house. (Tr. at 457:13; 463:18-464:3.)

292.    The problem has reoccurred in the past, but it has been resolved, at least temporarily, when it has arisen.  (Tr. at 463-466.)

293.    Debora has fallen on many occasions at school, one of which was serious enough to require four stitches.  (Tr. at 460:1-7.)

294.    There is a girl in Debora's school who is aggressive.[9]  (Tr. at 460:20-24.)

    2.    *Kathleen C.*

295.    Kathleen is a student with disabilities who attended the Reading School District from 2002 through her graduation in June 2011.  (Tr. at 35:2-6; 40:25-41:9.)

296.    Prior to enrolling in the Reading School District at the age of twelve, Kathleen was enrolled in the New York City School District in New York.  (Tr. at 35:7-8.)

---

[9] Both Defendants and Plaintiffs contend that Debora was injured by this student.  (Doc. No. 276 ¶ 291; Doc. No. 277 ¶ 301.)  The Court acknowledges that Mrs. Delcy testified that she received a note "that said if my daughter came home with a bruise or a scratch then it was this girl that had done it."  (Tr. at 461:1-3.)  Accepting Mrs. Delcy's statement as true, it could support a finding that the school expressed concern about the girl, but it does not support a finding that the girl actually injured Debora or any other student.

297.    Kathleen had a history of cardiac defects, was unable to eat independently, was having difficulty toileting, and was communicating only through sounds or one-word utterances.  She has been diagnosed with Downs Syndrome with mental retardation and hyperactivity.  (Tr. at 820:17-24; Pl. Ex. 201 at 202.)

298.    The Reading School District continued implementing the New York City IEP from the time of Kathleen's enrollment until it issued its own IEP on February 12, 2004.  (Tr. at 370:4-18.)

299.    Mrs. Leonidas, Kathleen's mother, speaks Spanish.  (Tr. at 34:14-22.)

300.    Mrs. Leonidas was invited to attend IEP meetings, the IEP invitations were in Spanish, an interpreter provided by the school district was available to Mrs. Leonidas at each IEP meeting,[10] Kathleen's IEPs were developed at least annually, and NOREPs were issued to Mrs. Leonidas indicating agreement with Kathleen's educational programs and placements.  (Tr. at 37:1-12, 43:22-25, 44-45:1-12, 821:20-822:3.)

301.    Some documents provided by the school were in Spanish, and some were Spanish templates with English filled in.  (Tr. at 45:18-46:6.)

302.    When a document contained English an interpreter would explain the English portion, and Mrs. Leonidas understood all documents that she signed.  (Tr. at 48:21-25-49:4.)

303.    Kathleen's IEP indicates that she was provided with extended school year services, speech and language services, and a personal care assistant.  (Tr. at 37:23-38:2; 39:6-19, 49:24-19; 821:13-19.)

304.    In 2009, Mrs. Leonidas requested longer extended school year services, but the district declined her request.  (Tr. at 37:23-25, 38:1-2; 39:6-19.)

305.    While at the Reading School District, Kathleen improved her verbal communication skills such that she was able to string words together for short sentences, she was completely self-sufficient with toileting, she could recognize sight words, she could write some letters, her self-help skills improved, she could eat with a spoon and fork independently, and she improved some of her gross motor skills. (Tr. at 821:3-12; Pl. Ex. 201 at 190-210.)

---

[10] Mrs. Leonidas indicated that even on those forms where the interpreter did not sign the document, an interpreter had explained the document to her so she could understand any English on the form.  (Tr. at 52:20-53:3.)

306. Mrs. Leonidas requested that Kathleen be placed in a classroom with less disabled students for a trial period. (Tr. at 42:15-18.)

307. Kathleen was placed in a classroom with less disabled students for three days, but was returned to her original classroom after that period. (Tr. at 42:14-18.)

308. Mrs. Leonidas contends that other than those three days, Kathleen was never able to attend classes with students who are less disabled than she is. (Tr. at 40:6-11.)

309. Beginning in May 2006, Kathleen's IEPs reflect that she spent between two and four hours per week receiving special education services in a regular education classroom.[11] (Pl. Ex. 201 at 70, 86, 118, 165, 188.)

310. Mrs. Leonidas received a notice of procedural safeguards in Spanish. (Tr. at 46:7-15; 49:20-25.)

311. Mrs. Leonidas did not request mediation, request a due process hearing, or file a complaint with the Department of Education. (Tr. at 51:1-19; 822:4-10.)

    *3.    Bryan B.*

312. Bryan is a student with a disability enrolled in the Reading School District. (Tr. at 814:23-25.)

313. Prior to enrolling in the Reading School District in 2004, when he was eleven years old, Bryan attended school in Puerto Rico. (Pl. Ex. 195 at 39.)

314. When he entered school at Reading he spoke Spanish. (Pl. Ex. 195 at 39.)

315. Bryan was identified as a student with a disability in Puerto Rico and he had an

---

[11] Defendants' amended proposed findings of fact contend that Kathleen spent between 2 and 5.65 hours per week in a regular education classroom. (Doc. No. 277 ¶ 358.) This appears to be based on a misreading of the charts for the IEPs developed in 2009 and 2010. In those years, the chart changes. Whereas the chart used to calculate the hours spent in a regular education classroom in 2006, 2007, and 2008, measured time spent per week in a regular education classroom with "column two" reflecting time per week in the regular education classroom, the chart used in 2009 and 2010 measured time spent per day in the regular education classroom with "column two" reflecting the total hours in a school day. The 5.65 hours figure reflects the total hours in a school day. In fact, the 2009 and 2010 reports reflect that Kathleen spent 0.50 hours per day in a regular education classroom, which the Court has extrapolated to mean that she spent approximately 2.5 hours per week in a regular education classroom, in line with prior years.

IEP from Puerto Rico.  (Tr. at 815:1-6.)

316.    As of 2008, Bryan was diagnosed with Attention Deficit Hyperactivity Disorder and was taking medication for attention, aggression, overeating, and sleeping. (Pl. Ex. 195 at 124.)

317.    Bryan was evaluated for special education services on December 11, 2007, on September 20, 2004, and on June 19, 2002.  Each report indicated that Bryan was eligible for special education services.  (Pl. Ex. 195 at 1, 33, 121.)

318.    During the 2004-2005 school year the Reading School District implemented the IEP Bryan was issued in Puerto Rico, which Bryan's mother approved.  (Pl. Ex. 195 at 20-31, 38-39, 257.)

319.    In November 2005, Bryan was treated at KidsPeace.  After he was discharged from KidsPeace on November 7, 2005, Byran's IEP team developed an IEP to be implemented from November 11, 2005, through November 11, 2006.  (Pl. Ex. 195 at 48-70, 80.)

320.    KidsPeace is a psychiatric hospital for children with behavioral problems.  (Tr. at 192:4-6.)

321.    The IEP team assigned Bryan to part-time emotional support classes and provided for English Language Acquisition classes.  The IEP did not assign Bryan to a class with a Spanish-speaking teacher or aide.  (Pl. Ex. 195 at 53-71.)

322.    The IEP amended Bryan's November 2005 IEP on February 7, 2006, and May 4, 2006, to address behavioral and attendance issues.  (Pl. Ex. 195 at 53, 69-70, 73-74, 86-90.)

323.    A bilingual school psychologist evaluated Bryan based on the Woodcock Munoz achievement test.  (Pl. Ex. 195 at 121-130.)

324.    Following the evaluation, the IEP team met again in February 2008, and recommended Bryan be placed in ESL classes for five hours per week.  (Pl. Ex. 195 at 150.)

325.    Bryan's mother attended IEP meetings and received notices of procedural safeguards informing her of her rights.  (Pl. Ex. 195 at 38, 54, 70, 100, 133, 167, 232, 260.)

326.    Bryan's parents never requested mediation, never requested a due process hearing, and never filed a complaint with the Department of Education.  (Tr. at 817:7-9.)

327.   Over the course of his time in the Reading School District Bryan showed little academic or behavioral progress.  (Tr. at 816:7-18.)

   4.   *Edwin E.*

328.   Edwin is a student with a disability who was enrolled in the Reading School District from the 2002-2003 school year through the 2006-2007 school year.  (Tr. at 187:15-19.)

329.   Prior to enrolling in the Reading School District,[12] Edwin attended the New York City School District in New York.  (Tr. at 822:15-19.)

330.   At the time of his enrollment, Edwin's mother, Mrs. Lisa, informed the Reading School District that Edwin was diagnosed with ADHD and was taking Concerta, Zoloft, and Seroquel at home and receiving services from the Reading Hospital. (Pl. Ex. 199 at 3-4.)

331.   Mrs. Lisa declined special education services for Edwin in New York and initially refused special education services for Edwin in Reading.  (Tr. at 173:1-19.)

332.   In his first year in Reading, Edwin experienced behavior difficulties and was reported as having made frequent visits to the school nurse for difficulty breathing, hyperventilation, and inconsolable crying.  (Pl. Ex. 199 at 1-4.)

333.   Edwin was evaluated in March of 2003, and was identified as emotionally disturbed and other health impaired and requiring specially designed instruction. (Pl. Ex. 199 at 9.)

334.   On October 2, 2006, an evaluation team determined that Edwin had a disability, specifically that he was emotionally disturbed and was other health impaired, and continued to be eligible for special education.   (Pl. Ex. 199 at 49.)

335.   During Edwin's time in the Reading School District he was also diagnosed with oppositional defiant disorder, anxiety disorder, and mood disorders.  (Tr. at 823:18-21.)

336.   While Edwin was enrolled in the Reading School District, Edwin received a number of different placements, specifically, Edwin was moved from the 13th and Union School, to KidsPeace, to Northeast Middle School, back to KidsPeace, to

---

[12] There is considerable conflicting testimony as to what grade Edwin was in when he entered the Reading School District.  The Court finds that his precise grade level upon entry is immaterial, and is satisfied that he was in either the third or fourth grade.

the 10th and Green School, back to KidsPeace, to the Northwest Middle School, to the Glenside School, back to KidsPeace, to the Cornell Abraxas School, and back to KidsPeace one final time before being sent to New Jersey to live with his father.  (Tr. at 174-187.)

337.    KidsPeace provided Edwin with therapeutic and psychiatric treatment, as well as limited academic tutoring.  (Pl. Ex. 199 at 12, 17-21, 54-63.)

338.    KidsPeace focused primarily on Edwin's emotional and mental health issues, rather than on academics.  (Tr. at 390:20-22.)

339.    Mrs. Lisa agreed to all of Edwin's placements because she believed the school district knew what was best for her child.  (Tr. at 184:8-18; 824:8-16.)

340.    In December 2006, KidsPeace reported that Edwin, who was in eighth grade at the time, was performing at a high seventh grade or eighth grade academic level. (Pl. Ex. 199 at 63.)

341.    Mrs. Lisa received notification of her procedural safeguards.  (Tr. at 194:9-20; Pl. Ex. 199 at 13, 30, 80.)

342.    Mrs. Lisa did not request a due process hearing or file a complaint with the Department of Education.  (Tr. at 184:19; 825:18-23.)

343.    The Reading School District invited Mrs. Lisa to attend IEP meetings, provided Mrs. Lisa with an interpreter as needed, and issued NOREPs to Mrs. Lisa.  (Tr. at 825:9-17.)

   *5.    Mauricio R.*

344.    Mauricio has attended the Reading School District since kindergarten. (Tr. 828:22-23.)

345.    Mauricio lives in a household where Spanish is the spoken language and speaks both English and Spanish. (Pl. Ex. 204 at 20, 46.)

346.    Mauricio was administered an early intervention evaluation with a Spanish interpreter when he was 49 months old.  (Pl. Ex. 204 at 24-25.)

347.    The early intervention evaluation found that Mauricio was significantly delayed in the cognitive areas of matching and counting.  (Pl. Ex. 204 at 24-25.)

348.    Prior to kindergarten, Mauricio was offered services in an Early Intervention program, which his parents refused. (Pl. Ex. 204 at 46.)

349.	During the 2005-2006 school year, when Mauricio was in kindergarten, Mauricio was evaluated and determined to be a student with a learning disability and later speech and language were added as a disability.  (Tr. at 829:18-25.)

350.	Mauricio achieved significant progress and was exited from special education after three years during the 2009-2010 school year.  (Tr. at 830:2-8.)

351.	The Reading School District issued Notices of Recommended Educational Placements ("NOREP") to Mauricio's parents reflecting that they agree with the program and services.  (Pl. Ex. 204 at 58-59, 83-84, 105-06, 135-38, 167-70.)

352.	Mauricio's parents received notice of procedural safeguards informing them of the right to seek mediation or due process or to file a complaint with the Department of Education if they disagreed with the IEP or the implementation of the IEP. (Pl. Ex. 204 at 62, 87, 108, 141.)

353.	Mauricio's parents did not seek due process or file a complaint. (Tr. 830:18-23.)

354.	Mauricio's parents were invited to all IEP meetings; his parents participated in the IEP team meetings; IEPs were developed and reviewed at least annually; and the Reading School District issued NOREPs reflecting that Mauricio's parents agreed with the program and services. (Tr. 830:9-23.)

	6.	*Sarah B.*

355.	Sarah is a student with a disability who has been enrolled in the Lancaster School District since 2000.  (Tr. at 9:14-10:5)

356.	Sarah is diagnosed with Down's Sydnrome and has an artificial heart valve, hypothyroidism, chronic ear fluid build up, vision deficits, and celiac disease. (Tr. at 10:20-21, 11:2-13.)

357.	Sarah lived with Mrs. Shirley since November 2000, as a foster child, and Mrs. Shirley adopted Sarah on November 30, 2004.  (Tr. at 10:1-5; 25:2-10.)

358.	Sarah has always been determined to be ineligible for extended school year services.  (Tr. at 16:21-22; Pl. Ex. 205 at 57, 82, 111, 139, 147, 184, 192.)[13]

---

[13] The reports cited on pages 82, 111, and 139 of Plaintiff's Exhibit 205 indicates that "Alondria" is ineligible for extended school year services.  The remainder of the reports refer to Sarah, as do the headers on the pages of the reports referring to "Alondria."  It appears the references to "Alondria" are typographical errors.

359.   Dr. Nicodemus believes the extended school year determinations may have been in error because they were conducted at the end of a school year rather than at the beginning when the evaluation would more accurately reflect Sarah's regression over the course of the summer.  (Tr. at 361:18-362:24.)

360.   In one school year a speech therapist was not available until November and Mrs. Shirley obtained substitute service for Sarah.  (Tr. at 15:18-16:4.)

361.   Although Sarah has participated in gym classes, Mrs. Shirley was unsatisfied with the availability of adaptive gym.  (Tr. at 12:6-14.)

362.   Sarah's March 2010 IEP provides for adaptive physical education five times per week for forty minute sessions.  (Pl. Ex. 205 at 183.)

363.   Mrs. Shirley was unsatisfied with the number of computers in her daughter's middle school classroom.  (Tr. at 17:22-18:5.)

364.   At the time of trial Sarah was using computers more than she ever did previously.  (Tr. at 16:23-25.)

365.   Sarah received speech services and occupational therapy.  (Pl. Ex. 205 at 23, 37, 49, 81, 110, 138, 183.)

366.   Sarah has made some educational progress and consistently met the annual goals set on her IEP.  (Tr. at 818:20-819:16.)

367.   Mrs. Shirley received notices of procedural safeguards with the IEPs and understood those safeguards. (Tr. at 28:20-29:17.)

368.   Mrs. Shirley did not file for due process or file any complaints with the Department of Education.  (Tr. at 820:3-9.)

369.   Mrs. Shirley was issued NOREPs indicating that she agreed with Sarah's education program and placement.  (Tr. at 819:25-820:2.)

## III.   CONCLUSIONS OF LAW

Following summary judgment, four claims remain to be adjudicated by this Court: Plaintiffs' claims based on the IDEA, Section 504, the ADA, and the EEOA.  The Court has made the necessary findings of fact.  Accordingly, the Court will now apply the law to those facts and evaluate the merits of Plaintiffs' claims seriatim.

37

A.      **IDEA Claim**[14]

In an effort "to ensure that all children with disabilities have available to them a free

appropriate public education," 20 U.S.C. § 1400, the IDEA sets forth a federal grant program

whereby states meeting certain requirements are eligible for federal funds to support special-

education services.  See 20 U.S.C. §§ 1411-1419.  Such funding is contingent upon the state

education authority establishing that it has policies and procedures in place to ensure, inter alia,

that: (1) a free and appropriate public education is available to all children with disabilities in the

state ("FAPE requirement"); (2) all children with disabilities in the state are identified, located,

and evaluated ("child find requirement"); and (3) children with disabilities in the state, "to the

maximum extent appropriate," are educated in the least restrictive environment, that is, with

children who are not disabled and that children be placed in special classes, separate schooling,

or removed to some other setting only when that child cannot be satisfactorily educated in a

regular education class ("LRE requirement").  20 U.S.C. § 1412(a).

In Plaintiffs' amended complaint, Plaintiffs allege that the Commonwealth of

Pennsylvania's formula for allocating special-education funding to Pennsylvania's school

districts, set forth at 24 P.S. § 25-2509.5, results in systemic deficiencies in the special-education

---

[14] The Court pauses to observe that Defendants filed a motion to dismiss Plaintiffs'
claims for failure to exhaust their administrative remedies as required by the IDEA.  See 20
U.S.C. § 1415(l) (providing that the procedures set forth in 20 U.S.C. § 1415(f) and (g)
providing for an administrative due process hearing and appeal be exhausted prior to the filing of
a claim pursuant to the IDEA).  Plaintiffs, relying on Beth V. by Yvonne V. v. Carroll, 87 F.3d
80, 88 (3d Cir. 1996), argued that the exhaustion requirement did not apply because they alleged
systemic violations which could not be resolved via individual administrative hearings.  (Doc.
No. 22.)  The Court agreed with Plaintiffs, concluding that the exhaustion requirement should be
waived because Plaintiffs are attempting to remedy a perceived systemic deficiency in the state
funding formula.  (Doc. No. 31.)

programs in the class school districts.  Specifically, Plaintiffs allege that the funding scheme

results in violations of the IDEA's mandates regarding FAPE, child find,[15] and LRE.[16]

### 1.    Free Appropriate Public Education

The IDEA defines a FAPE as:

> [S]pecial education and related services that – (A) have been
> provided at public expense, under public supervision and direction,
> and without charge; (B) meet the standards of the State educational
> agency; (C) include an appropriate preschool, elementary school, or
> secondary school education in the State involved; and (D) are
> provided in conformity with the individualized education program
> required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9).

At the heart of the FAPE requirement is the mandate that an individualized education

program ("IEP") must be developed for each disabled child.  See, e.g., Honig v. Doe, 484 U.S.

305, 311 (1988) (describing the IEP as the "primary vehicle" for implementing a FAPE); Susan

---

[15] It is unclear whether Plaintiffs seek relief based on a violation of the IDEA's child find requirement.  The amended complaint refers only to the LRE and FAPE requirements.  (Doc. No. 4 ¶ 75.)  However, in their brief in opposition to Defendants' motion for summary judgment, Plaintiffs discuss the violation of the child find requirement in addition to violations of the LRE and FAPE requirements.  (Doc. No. 149 at 22-23.)  Plaintiffs do not, however, discuss the child find requirement in their pretrial memorandum, in their proposed findings of law, or in their amended proposed findings of law.  (Doc. Nos. 229, 229-4, 276.)  In the interest of providing as thorough a review of the claims as possible, the Court will review the record as if Plaintiffs were pursuing a child find claim in addition to the LRE and FAPE claims.

[16] In their amended proposed findings of fact, Plaintiffs present a number of facts which appear to be intended to demonstrate Defendants' failure to properly monitor the implementation of Part B of the IDEA.  (Doc. No. 276 ¶¶ 280-287.)  This issue was never raised in Plaintiffs' amended complaint.  Even if it were, however, there are no facts of record that would connect an alleged failure to monitor state-wide implementation of Part B of the IDEA with the funding scheme being challenged here.  That is, there is no basis for concluding that the funding scheme results in improper monitoring.  Accordingly, to whatever extent Plaintiffs attempt to raise such a claim, that claim must necessarily fail.

N. v. Wilson Sch. Dist., 70 F.3d 751, 756 (3d Cir. 1995) (describing the IEP as the "primary mechanism" for implementing a FAPE).  "The IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential." Shore Reg'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 198 (3d Cir. 2004).  The IEP is developed by a team of specialists, in conjunction with the child's parents, and must include, inter alia, (1) a statement of the child's present level of educational performance; (2) a statement of measurable annual goals; (3) a description of how the child's progress will be measured; (4) a statement of special education and related services to be provided to the child; (5) an explanation regarding the extent to which the child will not participate with non-disabled children in regular educational programs; (6) a statement of testing modifications needed; and (7) projections regarding the initiation of services as well as their frequency, location, and anticipated duration. 20 U.S.C. § 1414(d); see also 22 Pa. Code § 14.131(a) (setting forth the Commonwealth of Pennsylvania's substantive IEP requirements).

In addition to requiring states to implement an IEP, the IDEA requires states to establish certain procedural safeguards for children with disabilities.  Among these procedural safeguards is the requirement that the states provide an impartial due process hearing where parents may dispute changes to their child's IEP.  20 U.S.C. § 1415.  At the due process hearing, parents must be given the "opportunity to present complaints with respect to any matter relating to the identification, evaluation, or educational placement of the child."  20 U.S.C. § 1415(b)(6); see also 34 C.F.R. § 300.507(a)(1); 22 Pa. Code § 14.162.  Moreover, any determination made at the due process hearing may be appealed to a second level of administrative review.  20 U.S.C. § 1415(i)(1).

The requirement that a school district provide a FAPE is not necessarily limited to the regular school year.  Rather, in certain circumstances, a school district may be required to provide a child with an extended school year program.  34 C.F.R. 300.106; 22 Pa. Code. § 14.132.  Not all children with an IEP, however, are eligible for extended school year programs. Children are only eligible for an extended school year program if such a program is necessary to provide the child with a FAPE.  34 C.F.R. 300.106(a)(2).  Pennsylvania regulations require IEP teams to consider a number of factors in making this determination including: the extent to which the child regresses when not in school, the child's ability to recoup information following a regression, the child's ability to achieve IEP goals and objectives in the absence of such a program, the need to maintain an important skill or behavior that has been mastered at the time when the school year is scheduled to be interrupted, the importance of the skills learned, and the severity of the child's disability.  See 22 Pa. Code. § 14.132(a)(2).

When considering an IDEA lawsuit based on the alleged denial of a FAPE, a court engages in a two-pronged inquiry.  First, a court must consider whether the state has satisfied the IDEA's procedural requirements.  Bd. of Educ. v. Rowley, 458 U.S. 176, 206-07 (1982). Second, the court must consider whether the child's IEP is reasonably calculated to enable the child to receive educational benefits.  Id.  In considering whether the substantive FAPE requirement has been met, the reviewing court must be cognizant of the fact that while the IDEA was designed to provide more than a de minimis educational benefit, the IDEA does not require that children with disabilities receive "the optimal level of services."  Holmes ex rel. Holmes v. Millcreek Twp. Sch. Dist., 205 F.3d 583, 589-90 (3d Cir. 2000) (quoting Carlisle Area Sch. v. Scott P. By and Through Bess P., 62 F.3d 520, 533-34 (3d Cir. 1995)).  Rather, the IDEA only

requires that the IEP provide a "basic floor of opportunity."  Id.; see also Rowley, 458 U.S. at

192 (noting that "the intent of the Act was more to open the door of public education to

handicapped children on appropriate terms than to guarantee any particular level of education

once inside").  The determination of an IEP's appropriateness must be made at the time the IEP

is offered and not at some later date.  Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031,

1040 (3d Cir. 1993) ("Neither the statute nor reason countenance 'Monday Morning

Quarterbacking' in evaluating the appropriateness of a child's placement.").  Of course, a court

must also remember that the purpose of the IDEA is to ensure "that disabled students receive an

appropriate education, not merely an appropriate IEP."  Ridgewood Bd. of Educ. v. N.E. ex rel.

M.E., 172 F.3d 238, 250 (3d Cir. 1999).

 Plaintiffs allege that the Commonwealth of Pennsylvania's special education funding

formula results in the systematic failure to provide FAPE in class school districts.  (Doc. No. 4 ¶

75.)  Notably, Plaintiffs have not made any allegations that Pennsylvania's funding scheme has

resulted in any procedural violations of the IDEA.  As explained by Patricia Hozella,

Defendants' expert on special education and special education monitoring and compliance, with

regard to each Plaintiff the districts complied with the IDEA's procedural requirements,

including notifying parents of their rights, having the parents participate in IEP meetings,

inviting the parents to participate in IEP meetings, providing interpreters to parents who did not

speak English as a first language, and revising IEPs as needed where children did not show

improvement.[17]  Nor is there any evidence that the procedures provided for by the IDEA to

---

[17] This testimony was not contradicted at trial, and indeed was confirmed by each of the
current special education directors and parents who testified.

challenge IEPs, such as due process hearings, are unavailable or inadequate – although the Court

notes that none of the class Plaintiffs did avail themselves of these procedures.  Plaintiffs have

made some arguments regarding language barriers in the IEP process; however, there is no

evidence of record to support such a finding.  Indeed, all the evidence suggests that interpreters

were available at each IEP meeting, that relevant documents were translated, that notices were

provided in the parents' native language, and that all parents fully understood their procedural

rights.  Accordingly, Plaintiffs can only succeed on their claim of a systematic denial of FAPE if

they are able to establish substantive denials of FAPE caused by funding shortfalls.

Upon a review of the evidence presented at trial, the Court must come to the conclusion

that even assuming arguendo that Plaintiffs have established the denial of a FAPE for any single

student, Plaintiffs have failed to establish that the funding formula was responsible for such

denial of FAPE.  Indeed, Plaintiffs failed to produce a single witness to testify that an IEP

decision was ever based on a lack of available funding.  On the contrary, individuals with

personal knowledge of IEP meetings testified repeatedly that a determination of what service to

provide was never made based on funding availability.  For example, Linda Brown, director of

special education for the York City School District, testified that when an IEP calls for a service,

she does not deny the service and she does not consider money in making such determinations.

(Tr. at 948:16-24.)  Likewise, Carole Clancy, supervising coordinator for the special education

for the Lancaster School District, testified that no person with fiscal responsibility has ever

rejected a service at an IEP meeting and that funding changes have not impacted the services

offered to students.  (Tr. at 1024:14-18; 1030:6-12.)  And Deborah Hartman, director of special

education for the Allentown School District, testified that she did not consider funding when

providing services, rather she stated that "we always went with the services first and then held our breath and looked at what the total was at the end of the day, because that's kind of how the law is about special education."  (Tr. at 296:20-25.)

In the absence of any clear testimony or other evidence in the record that would support a finding that a child had been denied his or her right to a FAPE as a result of the Commonwealth of Pennsylvania's funding formula, the Court cannot conclude that the funding formula violates the IDEA by systematically denying students a FAPE.  See, e.g., Quatroche v. E. Lyme Bd. of Educ., 604 F. Supp. 2d 403, 412-13 (D. Conn. 2009) (granting a motion to dismiss where plaintiffs failed to plead a causal connection between the alleged systemic violations and the challenged state action).  To the extent the children in this action were denied a FAPE, and the Court has not reached this conclusion, the evidence presented could only support a finding that the denials of a FAPE were the result of problems with the components of individual programs rather than systemic violations and that in the specific cases presented to the Court, the problems either were, or could have been, remedied by taking advantage of the administrative procedures in place.[18]  See Doe v. Arizona Dep't of Educ., 111 F.3d 678, 681 (9th Cir. 1997) (noting IDEA claims are not systemic where they involve only substantive complaints with programming

---

[18] Indeed, the testimony of the parents established that, in nearly every case, when the parents did raise concerns with their respective schools, those concerns were ultimately addressed.  For example, Mrs. Maritza, whose son attended the Reading School District, testified that "the first time [she] made any formal objection to [her] son's placement" the school arranged for her son to be placed in an alternative setting which she believes is very beneficial for her son.  (Tr. 167:23-25, 168:1-10, 169:10-18.)  Likewise, the gravamen of Mrs. Delcy's complaint about her daughter Debora's education is that Debora, who had severe physical disabilities, was supposed to be picked up in front of her home, but the school sent a bus to pick her up approximately one block from her home.  (Tr. at 458:11-14.)  Mrs. Delcy testified, however, that she raised these concerns to the director of special education and the bus now picks up her daughter in front of the house.  (Tr. at 457:13; 463:18-25; 464:1-3.)

components and if the administrative process is capable of correcting the problem); <u>Beth V. by Yvonne V.</u>, 87 F.3d at 89 (noting that in cases where exhaustion is waived, plaintiffs must establish system-wide failures).

The Court does acknowledge the substantial evidence provided by Dr. Baker that certain educational outcomes for special education students in the class districts are worse than educational outcomes for special education students in non-class districts.  The Court finds this information compelling, and indeed, the Court acknowledges that his findings would tend to support a hypothesis that children in schools with more available funding tend to achieve better results than students in schools with less available funding.  The value of this evidence was limited, however, by Dr. Baker's inability to directly tie funding levels to a denial of FAPE.  For example, while he was able to show that IEP students in class districts tended to do worse on PSSA tests than students in non-class districts, a student who fails to meet the state standards on a PSSA has not necessarily been denied a FAPE.  Indeed, across Pennsylvania, an IEP student passing a PSSA is the exception rather than the rule, and the Court would be hard-pressed to contend that the majority of IEP students in the Commonwealth are denied a FAPE.  The evidentiary value of Dr. Baker's findings is further undermined by the fact that, by his own calculation, for most of his findings, between 70 percent and 90 percent of the variation between students in the class districts and those outside the class districts is explained by factors other than funding levels.[19]

_____

[19] These figures, which Dr. Baker noted are not uncommon in social science research, bolster the Supreme Court's admonition that the "complexity of the problems of financing and managing a statewide public school system" suggests that the courts should be wary of imposing "inflexible constitutional restraints" on state funding schemes.  <u>San Antonio Indep. Sch. Dist. v. Rodriguez</u>, 411 U.S. 1, 42-43 (1973).

In sum, the Court recognizes that at least some educational disparities may be explained by funding levels.  The Court has not, however, been tasked with determining whether Defendants have failed to equalize educational outcomes across the Commonwealth.  Nor has the Court been tasked with resolving the more compelling issue of whether Defendants have failed to ensure that all IEP students across the Commonwealth have an equal likelihood of success.  Within the IDEA, the Court is restrained to ask a more limited question, namely, whether Defendants' funding mechanism has caused Plaintiffs to be denied their statutory floor of opportunity, namely a FAPE.  Plaintiffs have failed to provide evidence establishing systemic denials of FAPE and they have failed to provide evidence establishing the critical causal link between the Commonwealth's statutory funding scheme and the denial of FAPE.  In the absence of such evidence, the Court cannot find that the Commonwealth's statutory funding scheme violates the IDEA's FAPE requirement.

## 2.    *Child Find*

As a necessary corollary to the IDEA's requirements regarding the procedural and substantive rights of children with disabilities, the IDEA also imposes a child find requirement. The child find requirement mandates that states and local educational agency establish regulations and procedures to ensure that all children with disabilities are "identified, located, and evaluated" for eligibility for special education and related services.  20 U.S.C. § 1412(a)(3)(A); 34 C.F.R. § 300.111; Anello v. Indian River Sch. Dist., 355 F. App'x 594, 596 (3d Cir. 2009); Richard S. v. Wissahickon Sch. Dist., 334 F. App'x 508, 510-11 (3d Cir. 2009). The child find requirement mandates that school districts identify and evaluate all students who are reasonably suspected of having an educational disability as understood by the IDEA.  P.P. v.

West Chester Area Sch. Dist., 585 F.3d 727, 738 (3d Cir. 2009).  To establish a procedural

violation of the child find requirement, a plaintiff must establish that school officials overlooked

signs of disability and were negligent in failing to order testing.  Bd. of Educ. v. L.M., 478 F.3d

307, 313 (6th Cir. 2007).  Even children who are only suspected of having a disability, although

they are progressing from grade to grade, are protected by the child find requirement.  34 C.F.R.

§ 300.111(c).  Pennsylvania codifies its "child find" duties at 22 Pa. Code §§ 14.121-14.125.

Plaintiffs' case regarding the child find requirement appears to be that the funding

formula violates the IDEA because it creates a disincentive to identify students as eligible for

special education.  The trial record is utterly devoid of any evidence establishing systematic, or

even isolated, violations of the IDEA's child find requirement.[20]  Nor did Plaintiffs make any

---

[20] At summary judgment Plaintiffs relied on a table outlining the rates of children who were referred for special education testing but not classified by the district as eligible for special education.  Plaintiffs included this table in their pre-trial exhibit list as Plaintiffs' Exhibit 64; however, they did not move for the admission of this table at trial.  Accordingly, the Court will not consider it.  The Court is satisfied, however, that even if the table were admitted, it would not be persuasive in establishing a violation of the child find requirement.

The table is flawed in several respects.  First, the number of districts surveyed varies considerably in the three years surveyed.  In the first school year the table includes seventy-three districts (fifty-eight non-class districts and fifteen class districts); in the second year the table includes 297 districts (263 non-class districts and thirty-four class districts); in the third year the table includes 310 districts (275 non-class districts and thirty-five class districts); and in the three-year average the table includes sixty-eight districts (fifty-seven class districts and eleven non-class districts).  Of course, the total number of districts, both class and non-class in the Commonwealth, is 501.  There is no explanation given for the variation in total district numbers from year to year.  Nor is there an explanation regarding why the districts were selected or what districts were selected.

Second, whether children are referred, but not classified as special needs is a decidedly poor measure of a failure to comply with the child find requirement.  The Court would be more interested in the rates of children referred for testing.  Under Plaintiffs' theory that schools decline to place children in special education because of incentives created by funding shortfalls, it would be far more likely, accepting Plaintiffs' theory as correct, for the district to fail to identify the children in the first place rather than going through the trouble of testing the children and only after a record has been made, to improperly classify them.

effort to connect any such violation to the Commonwealth's special education funding formula. Plaintiffs can point to nothing beyond naked speculation about potential incentives. This cannot support a finding that the child find requirement was violated.

Contrary to Plaintiffs' bald speculation, Defendants have presented ample evidence to support a finding that the class districts are compliant with the child find requirement. For example, the uncontested testimony of Linda Brown, director of special education at the York City School District, established that the York City School District has in place practices designed to inform parents of students as well as the general public regarding services offered through the IDEA, the process for early identification of students, and the rights of parents under the IDEA. She also outlined procedures for identifying eligible students within the school as possibly being eligible for special education. Each of the other special education supervisors who testified similarly outlined extensive efforts those districts undertook to identify and evaluate special needs students. In the absence of any evidence that any school district

---

Third, there is no indication that the children who were not classified as special education should have been. There are a number of perfectly innocent possible explanations for the higher "not classified" rates in class districts than non-class districts. For example, many of the class districts have high LEP populations. In light of the special challenges non-English speaking children present, which were described by Dr. Nicodemus (Tr. at 342:23-25, 343:1-3), it is possible that teachers make referrals of children they believe to be special needs who in fact do not have any learning disability but rather are having difficulty in school because of language barriers.

Finally, and perhaps most importantly, the disparity in classification rates between the class and non class districts is hardly significant, and the disparity is almost completely attributed to one year in which a strikingly low number of districts were sampled. In the first year, when only fifteen class districts and fifty-eight non-class districts were sampled, there was an eleven percentage point difference between the class and non-class districts. In the second year the difference was only three percentage points. In the third year, when the most districts were sampled, there was a two percentage point difference in which the non-class districts actually had a higher rate of "not classified" students than the class districts.

committed a child find violation, or that any such violation was the result of the Commonwealth

of Pennsylvania's special education funding formula, the Court cannot strike down the funding

formula on this basis.

3.    *Least Restrictive Environment*

The IDEA's LRE requirement mandates that:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A); see also 34 C.F.R. § 300.115 (requiring school districts to provide a

continuum of alternate placements ranging from instruction in regular classes to instruction in

hospitals as well as supplementary services to be provided in conjunction with regular class

placement).  In short, the LRE requirement creates a presumption in favor of integrating children

with disabilities, "to the maximum extent appropriate," into regular education classes.  See, e.g.,

A.G. v. Wissahickon Sch. Dist., 374 F. App'x 330, 333 (3d Cir. 2010); Cordero v. Pa. Dep't of

Educ., 795 F. Supp. 1352, 1359 (M.D. Pa. 1992).

Of course, while mainstreaming a child, that is, placing him in a regular education

classroom, is a goal of the LRE requirement, it cannot be achieved uniformly, and indeed may in

certain circumstances actually violate the IDEA.   See, e.g., Capistrano Unified Sch. Dist. v.

Wartenberg By & Through Wartenberg, 59 F.3d 884, 897 (9th Cir. 1995) (holding that where

separate teaching would produce superior results to mainstreaming, mainstreaming is neither

appropriate nor satisfactory).  To that end, the Third Circuit has crafted a two-part test to

determine whether a school district is complying with the LRE requirement: (1) a court must

determine whether education can be satisfactorily achieved in a regular education classroom with

the aid of any accommodations; and (2) if it cannot, a court must determine whether the child has

been mainstreamed to the maximum extent possible in his alternate placement.  Wissahickon

Sch. Dist., 374 F. App'x at 333 (quoting Oberti v. Bd. of Educ., 995 F.2d 1204, 1215 (3d Cir.

1993)).  Plaintiffs contend that Pennsylvania's special education funding scheme violates the

IDEA by creating an incentive for class school districts to educate students in overly restrictive

environments, thus resulting in the class school districts systematically violating the LRE

requirement.  (Doc. No. 4 ¶ 76.)  In support of this claim Plaintiffs rely in part on anecdotal

evidence from the class Plaintiffs and in part on a statistical survey conducted by their expert Dr.

Bruce Baker.

      Regarding the evidence proffered by Dr. Baker, the Court finds that it cannot support a

finding of an IDEA violation based on the LRE requirement.  Dr. Baker identified an

approximately three percentage point difference between the percentage of students placed in

restrictive settings in class districts as opposed to students placed in restrictive settings in non-

class districts.  The formula does not, however, establish that the placements of students in the

class districts was inappropriate.  As has been noted, restrictive placements in and of themselves

do not establish that the LRE requirement has been violated.  Wartenberg, 59 F.3d at 897.  Dr.

Baker has not provided any information regarding whether the class school districts have failed

to provide "a continuum of alternative placements to meet the needs of handicapped children."

See L. E. v. Ramsey Bd. of Educ., 435 F.3d 384, 390 (3d Cir. 2006) (quoting 34 C.F.R. §

300.551(a)) (reviewing the factors a court must consider in determining whether a school district

has failed to meet the LRE requirement); Cordero, 795 F. Supp. at 1352 (concluding that Pennsylvania's "approved private school system" for educating special education students violated the IDEA by failing to make available a continuum of placement options).  Nor has Dr. Baker compared the supplementary aids and services provided by the districts to determine whether the district has the support systems in place to mainstream children to the maximum extent possible.  Id. (quoting Oberti, 995 F.2d at 1214).  In sum, Dr. Baker's findings show that children with disabilities are slightly more likely to be placed in restrictive environments in class districts than non-class districts.  The findings are silent, however, as to whether these placements are appropriate or whether the districts have the resources they need to comply with the LRE requirement.

Even if the data were an accurate measure of LRE compliance, however, the Court must note the limited value of Dr. Baker's data.  Dr. Baker has found that on average 4.3 percent of special education students in class districts with more than 5,000 are placed in alternative education, while 1.4 percent of special education students in non-class districts with more than 5,000 students are placed in alternative education.  (Pl. Ex. 31.)  Although less than clear from the exhibit, there appear to be approximately twelve class districts represented on Dr. Baker's chart.  All but two of those class districts fall somewhere between zero and five percent.  The Reading School District appears to fall just barely above five percent, whereas the Harrisburg City School District falls above fifteen percent.  Accordingly, if one were to disregard the Harrisburg City School District, which is a significant outlier district, all of the class and non-class districts fall between approximately zero and five percent, with most appearing to fall between what the Court estimates to be approximately the two-percent and three-percent mark

on the vertical axis.  Given that the non-class districts fall between zero and five percent, with most falling between zero and three percent, the Court would be hard pressed to conclude that there were significant differences between the non-class and class districts sampled in the exhibit.

In addition, the Court observes that of the 501 school districts in Pennsylvania, only a small sample are included in Plaintiffs' Exhibit 31.  Plaintiffs do not argue that the data regarding districts with an enrollment exceeding 5,000 students is representative of all 501 school districts in the Commonwealth or that the data regarding the class districts included in the exhibit are representative of all class districts.  Accordingly, even if the exhibit did show significant differences between the listed class and listed non-class districts, the data would not support a finding that the funding scheme violates the LRE requirement.

The remaining evidence provided by Plaintiffs in support of individual LRE violations is similarly unpersuasive.  Although witnesses such as Dr. Richardson testified that students were denied placements, Plaintiffs did not support that testimony with evidence that those placements were denied because of funding shortfalls or that those placements were appropriate for the children in question.  Further, as was noted in the previous sections, to the extent any children were not placed in the correct educational setting, Plaintiffs have not produced evidence linking the cause of any unlawful educational placement to the Commonwealth's special education funding formula.

Plaintiffs have produced evidence showing that the rates of restrictive placements in certain types of schools tend to be slightly higher in the class districts than the non-class districts. They have not, however, produced any evidence linking the Commonwealth's statutory funding

formula to class school districts unlawfully placing students in more restrictive educational placements.  In short, even if the Court were to give Plaintiffs the benefit of every doubt, at best Plaintiffs would only be able to establish that, in a subset of schools, there may be a correlation between restrictive placements and special education funding levels.  However, in the absence of any evidence establishing that those placements violated the IDEA, that the alleged IDEA violations were systematic in the class districts, or that the funding formula was the cause of the systematic IDEA violations, the Court cannot invalidate the Commonwealth's statutory funding model.  Accordingly, on this claim, the Court must find for Defendants.

 **B.**  **Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act Claims**

 The same standards govern both the Section 504 and ADA claims, thus the Court will address Plaintiffs' claims raised pursuant to these statutes in tandem.  Chambers ex rel. Chamber v. Sch. Dist. of Phila. Bd. of Educ., 587 F.3d 176, 189 (3d Cir. 2009); McDonald v. Pennsylvania, 62 F.3d 92, 95 (3d Cir. 1995); Schorr v. Borough of Lemoyne, 243 F. Supp. 2d 232, 235 n.1 (M.D. Pa. 2003).  Section 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 U.S.C. § 794(a).  Likewise, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  In order to establish a violation of Section 504 or the ADA, a plaintiff must prove that "(1) he is 'disabled' as defined by the Act; (2) he is 'otherwise qualified' to participate in school activities;

(3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school."[21]  Ridgewood, 172 F.3d at 253.

Section 504 and the ADA are closely related to the IDEA.  P.P. v. West Chester Area Sch. Dist., 585 F.3d 727, 735 (3d Cir. 2009).  For example, the Rehabilitation Act's regulations adopt the IDEA's FAPE requirement providing that with respect to public education services, a qualified handicapped person is a person "to whom a state is required to provide a free appropriate public education under [the IDEA]."  34 C.F.R. § 104.3(l)(2).  To that end, while the IDEA is couched in an affirmative duty to provide a FAPE, Section 504 and the ADA achieve, in essence, the same end by prohibiting entities from denying a FAPE to qualified individuals.  Andrew M. v. Del. Cnty. Office of Mental Health & Mental Retardation, 490 F.3d 337, 350 (3d Cir. 2007) (explaining that "violations of Part B of the IDEA are almost always violations of the [Rehabilitation Act]"); W.B. v. Matula, 67 F.3d 484, 492-93 (3d Cir. 1995) ("There appear to be few differences, if any, between IDEA's affirmative duty and § 504's  negative prohibition.").

In the present action Plaintiffs have presented a moving target of allegations regarding their Section 504 and ADA claims.[22]  However, the gravamen of their Section 504 and ADA

---

[21] The sole difference between Section 504 and the ADA is the ADA does not require proof of federal financial assistance to establish a prima facie violation.  See 42 U.S.C. § 12132.

[22] In their complaint, Plaintiffs assert their Section 504 and ADA claims independently from one another.  The complaint alleges that Defendants have violated Section 504 by: (1) excluding Plaintiffs from participation in educational programs; (2) utilizing criteria or methods of administration that have the purpose or effect of defeating or substantially impairing the accomplishment of the objective of the Commonwealth's program with respect to disabled persons; and (3) failing to administer programs so Plaintiffs could participate in the most integrated setting appropriate to their needs.  (Doc. No. 1 ¶¶ 79-80.)  The complaint further alleges that Defendants have violated the ADA because "association with high concentrations of

claims, namely that they have been denied access to educational opportunities, are based on the

same allegations and theories that underlie their IDEA claims.  Because Plaintiffs have failed to

establish a violation of the IDEA, and because the Section 504 and ADA claims are inextricably

linked to the IDEA claims, the Court cannot find that Plaintiffs have established a violation of

Section 504 or the ADA.  See, e.g., Miller ex rel. S.M. v. Bd. of Educ., 565 F.3d 1232, 1246

(10th Cir. 2009) (noting "that complying with the IDEA is sufficient to disprove educational

discrimination"); Melissa S. v. Sch. Dist., 183 F. App'x 184, 189 (3d Cir. 2006) (concluding that

summary judgment was warranted as to a Section 504 claim where the court had previously

─────────────────────

special education students has a negative funding effect on both disabled and non-disabled students."  (Id. ¶ 82.)

    In response to Defendants' motion for summary judgment, Plaintiffs merge their Section 504 and ADA claims asserting that Plaintiffs' "rights under Section 504 and the ADA were violated by the same acts and omissions which violated Part B of the IDEA (LRE, FAPE, and Child Find)."  (Doc. No. 149 at 53.)

    In their pretrial brief, Plaintiffs asserted that the Section 504 and ADA violations stem from "systemic denials of access to benefits and services to special education students in the class districts."  (Doc. No. 229 at 15-16.)

    Finally, in their proposed conclusions of law and amended proposed conclusions of law, Plaintiffs once again merge their Section 504 and ADA claims; however, they list eight ways in which those statutes were violated: (1) "by affording qualified disabled persons in the class school districts an opportunity to participate in or benefit from [an] aid, benefit[,] or service that is not equal to that afforded to others;" (2) "by providing class members with an aid, benefit[,] or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as provided [to] others;" (3) "by providing a different aid, benefit[,] or service to class members than is provided to others;" (4) by otherwise limiting class members in the enjoyment of the privileges, advantages[,] or opportunities enjoyed by others receiving the aid, benefit, or service;" (5) "by failing to provide class members with equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others in the most integrated setting appropriate to their needs;" (6) "because [the funding formula] has the effect of subjecting class members to discrimination on the basis of disability;" (7) "because [the funding formula] has the effect of substantially impairing accomplishment of the objectives of the Defendants' program or activity with respect to class members;" and (8) by refusing to modify their funding formula "because such modification is necessary to avoid discrimination on the basis of disability." (Doc. Nos. 229-4, 276.)

found summary judgment was warranted as to an IDEA claim based on the same underlying

allegations); N.L. v. Knox County Schs, 315 F.3d 688, 696 (6th Cir. 2003) ("In sum, precedent

has firmly established that Section 504 claims are dismissed when IDEA claims brought on the

theory of a denial of free appropriate public education are also dismissed.").[23]   Accordingly, the

Court must find for Defendants on these claims

### C.      Equal Educational Opportunities Act Claims

The EEOA prohibits the denial of "equal educational opportunity to an individual on

account of his or her race, color, sex, or national origin, by . . . the failure by an educational

agency to take appropriate action to overcome language barriers that impede equal participation

by its students in its instructional programs."  20 U.S.C. § 1703(f); Horne v. Flores, 129 S. Ct.

2579, 2588 (2009).  The EEOA defines "educational agency" as both a local educational agency

and a "state educational agency" as that term is defined in the Elementary and Secondary

Education Act of 1965.  Id.  20 U.S.C. § 1720(a).  The Elementary and Secondary Education Act

of 1965, in turn defines "state educational agency" as "the agency primarily responsible for the

State supervision of public elementary schools and secondary schools."  20 U.S.C. § 7801(41).

In Pennsylvania, the Pennsylvania Department of Education has retained this responsibility.

See, e.g., Hendricks v. Gilhool, 709 F. Supp. 1362, 1368 (E.D. Pa. 1989).

---

[23] The Court acknowledges that in some circumstances a school can comply with the
IDEA but fail to comply with Section 504 and the ADA.  For example, in Hornstine v. Twp. of
Moorestown, 263 F. Supp. 2d 887 (D.N.J. 2003), the court found that although the school did not
violate the IDEA, that the school did violate Section 504 and the ADA by designating multiple
valedictorians where a child with disabilities earned the highest weighted grade point average.
That case, however, is critically different from the present action in that the child's claims of
discrimination in that case were not linked to a denial of FAPE or any other right provided for
under the IDEA.  Id. at 901.  Here, all claims of discrimination are based, at their core, on a
denial of FAPE.

Plaintiffs contend that because the Commonwealth's special education funding formula, codified at 24 P.S. § 25-2509.5, fails to take into account the needs of schools with high concentrations of non-native language speakers, the formula constitutes a failure on the part of the Commonwealth to take appropriate action to overcome language barriers.  That is, Plaintiffs contend that the funding formula violates the EEOA because it fails to provide for the extra expense of providing services to students who are both LEP and special-education students. This Court previously adopted the standard articulated by the United States District Court for the Northern District of Illinois and held that to establish an EEOA violation, Plaintiffs must establish: "(1) language barriers; (2) defendant's failure to take appropriate action to overcome these barriers; and (3) a resulting impediment to students' equal participation in instructional programs."  See Leslie v. Bd. of Educ., 379 F. Supp. 2d 952, 960 (N.D. Ill. 2005).

The Court is satisfied that Plaintiffs have established the existence of language barriers. The relevant class of Plaintiffs is comprised of individuals whom the local educational agencies have already classified as LEP and Plaintiff has offered credible and compelling testimony regarding the challenges faced by certain of their class members.  Where Plaintiffs' EEOA claim necessarily fails, however, is the second and third elements, namely, the failure to take appropriate action and resulting impediments to the students' equal participation in instructional programs.

Congress granted the states broad discretion in determining which programs and techniques should be implemented to satisfy the EEOA's requirement to take "appropriate action to overcome language barriers."  Horne, 129 S. Ct. at 2589 (quoting Castaneda v. Pickard, 648 F.2d 989, 1009 (5th Cir. 1981)).  Pursuant to the rubric formulated by the Fifth Circuit in the

leading EEOA case, Castaneda v. Pickard, when evaluating whether a particular language program constitutes an "appropriate action" under 20 U.S.C. § 1703(f), a reviewing court must determine whether: (1) "a school system is pursuing a program informed by an educational theory recognized as sound by some experts in the field or, at least, deemed a legitimate experimental strategy;" (2) "the programs and practices actually used by a school system are reasonably calculated to implement effectively the educational theory adopted by the school;" and (3) the program, "after being employed for a period of time sufficient to give the plan a legitimate trial . . . produce[s] results indicating that the language barriers confronting students are actually being overcome." 648 F.2d 989, 1009-10 (5th Cir. 1981); see also Valeria G. v. Wilson, 12 F. Supp. 2d 1007, 1017-18 (N.D. Cal. 1998) (applying the Castaneda standard).

Plaintiffs in the present matter do not, however, actually challenge the appropriateness of any particular educational program.  Rather, they allege that the special education funding formula's failure to account for LEP students is ipso facto a violation of the EEOA.  Plaintiffs theory, however, is squarely foreclosed by the Supreme Court's holding in Horne v. Flores.  In that case, the Supreme Court noted that although funding is necessary to implement "appropriate action" as required by the EEOA, "funding is simply a means, not the end."  Horne, 129 S. Ct. at 2597.  Accordingly, the Supreme Court held that "requiring [a state] to demonstrate 'appropriate action' through a particular funding mechanism" is impermissible.  Id.  Plaintiffs have not identified any action taken by the Commonwealth other than implementing the special education funding formula which they allege ran afoul of the EEOA.  Because the EEOA's "appropriate action" requirement neither "require[s] any particular level of funding" nor "require[s] that the money come from any particular source," id. at 2605-06, the Court cannot invalidate the special

education funding formula on the grounds that it is not the source of funding for ESL programming.

Moreover, even if the Court were permitted to mandate that a state provide funding for ESL programming from specific sources, Plaintiffs have produced little evidence in support of their claim that the funding formula resulted in an impediment to LEP special education students' equal participation in instructional programming.  While certain witnesses have expressed concerns regarding the availability of bilingual teachers and instructional material, Plaintiffs have not linked these shortages in the ESL programs to the Commonwealth's special education funding formula or to any deficiency in any Commonwealth program or practice. Further, at various points in this litigation Plaintiffs have made arguments regarding the ability of the local school districts to provide Spanish-language interpreters and psychologists to conduct evaluations.  The evidence produced at trial, however, suggests these services are in fact being provided.

In sum, Plaintiffs' complaint alleges that the Commonwealth's special education funding formula violates the EEOA because it fails to account for LEP students.  This alone does not support a finding that the EEOA was violated.   Now, Plaintiffs ask this Court to direct the Commonwealth to mandate that funding for particular ESL services be provided by a particular funding source.  The EEOA neither requires nor permits the Court to do so.  Even if the EEOA did permit the Court to refashion a state special education budget, Plaintiffs have failed to produce evidence to support a finding that the formula prevents schools from hiring Spanish-speaking counselors and translators or providing ESL services to LEP students.  Accordingly, the Court may not invalidate the funding formula on this basis, and Plaintiffs' EEOA claims

must fail.

## III.  CONCLUSION

Plaintiffs have demonstrated that the special education programs available in the class districts fall far short of compensating for the serious disadvantages and barriers that impede the progress of thousands of the Commonwealth's children.  If, as was observed by Horace Mann, "[e]ducation . . . beyond all other devices of human origin, is a great equalizer of the conditions of men," Horace Mann, Twelfth Annual Report to the Massachusetts State Board of Education (1848), by a number of different metrics, the special education system in Pennsylvania is failing to fulfill its promise and requires thoughtful examination and reevaluation.  Plaintiffs' legal challenge, however, required them to not merely identify the obvious deficiencies in the quality of special education in the Commonwealth's low-income schools.  Rather, they faced the heavier burden of establishing that these deficiencies rise to the level of systemic statutory violations and that such violations were the result of the Commonwealth's special education funding formula. Plaintiffs failed to satisfy their burden on both counts.  Regarding their IDEA claims, Plaintiffs showed that certain outcomes were different, but they failed to show that those differing outcomes were IDEA violations or, to the extent IDEA violations did occur, that those violations were the result of the Commonwealth's funding formula.  The Section 504, ADA, and EEOA claims failed for similar reasons.  Ultimately, Plaintiffs have presented a compelling argument for effecting a change in policy.  Under our system of government, however, it is the duty of the people and their elected representatives to effect such change.  As was explained by Chief Justice John Roberts:

> [Judges] are vested with the authority to interpret the law; we possess
> neither the expertise nor the prerogative to make policy judgments.

60

> Those decisions are entrusted to our Nation's elected leaders, who
> can be thrown out of office if the people disagree with them.  It is not
> our job to protect the people from the consequences of their political
> choices.

Nat'l Fed. Of Indep. Bus. v. Sebelius, No. 11-393, __ S. Ct. __ (2012).  Plaintiffs have raised

serious questions about the impact of the Commonwealth's special education funding formula on

the quality of special education in Pennsylvania, yet they have been unable to establish that the

formula violates any federal statute.  Accordingly, the Court is compelled to enter judgment in

favor of Defendants on all claims remaining in this action.

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CG, et al.,** | : | |
| **Plaintiffs** | : | **Civil Action No. 1:06-CV-1523** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **THE COMMONWEALTH OF** | : | |
| **PENNSYLVANIA DEPARTMENT OF** | : | |
| **EDUCATION and GERALD** | : | |
| **ZAHORCHAK,** | : | |
| **Defendants** | : | |

## <u>ORDER</u>

**NOW**, on this 23rd day of August 2012, **IT IS HEREBY ORDERED THAT** the Court

finds in favor of Defendants on all remaining claims.  The Clerk of Court is directed to enter

judgment in favor of Defendants and close the case.

S/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania

62